Deloris M. SAUNDERS, Plaintiff,

v.

The GEORGE WASHINGTON
UNIVERSITY, Defendant.

Civ. A. No. 89–2631–LFO.

United States District Court,
District of Columbia.

June 20, 1991.

Abe W. Weissbrodt, John P. Racin, Weissbrodt, Racin & Mielke, Washington, D.C., for plaintiff.

Thomas D. Quinn, Jr., Jack M.H. Frazier, Michael A. Dymersky, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

In this action, Dr. Deloris Saunders, an associate professor at defendant George Washington University (GWU), sues the university for racial discrimination and retaliation in violation of 42 U.S.C. § 1981 and the D.C. Human Rights Act Statute. Currently before the Court are Saunders' motion for a preliminary injunction and defendant's motion for summary judgment. A hearing on both motions was held on May 31, 1991. It was not, however, possible at that time to resolve all the complicat-

ed factual and legal questions raised by them. Accordingly, a temporary restraining order was issued. *See* Order of May 31, 1991; *see also* Order of June 10, 1991 (extending the TRO for ten additional days). The parties have since submitted additional briefing, and an evidentiary hearing was held on June 17 and 18, 1991. Accordingly, the motions are now ripe for resolution.

For reasons to be stated in a forthcoming memorandum, the accompanying order will grant GWU's motion for summary judgment in part and deny it in part, and for the reasons stated below and to be elaborated in supplemental findings of fact, that order will also grant Saunders' motion for a preliminary injunction.

## I.

The standard for granting preliminary injunctive relief is well-settled:

> To determine whether an injunction is appropriate the District Court should balance (1) the likelihood of the plaintiff's success on the merits, (2) the threat of irreparable injury to the plaintiff in the absence of an injunction, (3) the possibility of substantial harm to other interested parties from a grant of injunctive relief, and (4) the interests of the public.

*Wagner v. Taylor*, 836 F.2d 566, 575 (D.C.Cir.1987) (footnote omitted); *see generally Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958).

## II.

As will be discussed in the forthcoming memorandum on GWU's motion for summary judgment, Saunders does not state claims under § 1981 for retaliation or for failure to renew her contract. She does, however, raise a genuine issue as to all other claims in her complaint, and there is a substantial likelihood that she will succeed on several of those claims.

■ To prove that a failure to promote violates § 1981, a plaintiff must prove, first, that the promotion would have created a "new and distinct relation" between herself and GWU and, second, that she was denied that promotion due to racial animus. *See generally Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Such animus may be proven either directly or through the scheme of circumstantial proof of discrimination developed in the *McDonnell Douglas Burdine* line of cases. *See id.* 109 S.Ct. at 2377.

Saunders has shown a substantial likelihood that she will prove that the Department's decision to defer consideration of her requests for renewal in the fall of 1989 and the spring of 1989 violated § 1981. First, the request for conversion was essentially a request for promotion from a contract position to a tenure-accruing one. That promotion would have created a "new and distinct relation" between the university and Saunders by ensuring her, though not absolutely guaranteeing, tenure and lifetime employment with the university.[1] *See Patterson*, 109 S.Ct. at 2377. Second, according to the evidence currently in the record, Saunders was both eligible and qualified for conversion to tenure track, and there is no credible evidence suggesting that she lacks integrity.[2] Third, Saunders is also likely to prove at trial that the justifications offered—that the enrollment in the program was insufficient and that Dean Leonard should be consulted due to his expertise in policy studies—were pretexts.[3] Finally, evidence in the record sug-

---

1. *See* Greenberg Affidavit ¶ 12; Holmes Affidavit ¶ 5; Lilly Affidavit ¶ 8; Paratore Affidavit ¶ 7; *see also* Memorandum from George W. Smith to Dr. Deloris Sunders, November 23, 1987 (Defendant's Motion for Summary Judgment, Exhibit 7) (referring to Saunders' request as a "proposal to be granted tenure").

2. *See* First French Declaration ¶ 2; Greenberg Affidavit ¶ 2; Holmes Affidavit ¶ 2; Paratore Affidavit ¶ 2; Memorandum from Roderick S. French to George Smith, November 30, 1989 (Plaintiff's Opposition, Exhibit 1).

3. *See* Greenberg Affidavit ¶ 3; Holmes Affidavit ¶ 9; Lilly Affidavit ¶ 3; Paratore Affidavit ¶¶ 3, 5; Memorandum from Jay R. Shotel to Dr. George Smith, March 9, 1988 (Smith Deposition, vol. 1, GS–11, at 32); Leonard Deposition at 181–82.

gests discriminatory patterns and motives in some members of the Department.[4]

Because of this evidence of discrimination, Saunders is likely, though not quite so likely, to prove that the Department violated § 1981 in denying her request for conversion in the fall of 1988. She is, however, substantially likely to prove that the justification offered in 1989 for denying her request—that her publication record was inadequate—was a pretext for discrimination.[5]

■ Saunders is also substantially likely to prove that in 1989 members of the Department retaliated against her for filing this suit. In order to prove retaliation under the D.C. Human Rights Act Statute, a plaintiff must show (a) that she was engaged in a protected activity, (b) that the employer took adverse action, and (3) that there was a causal connection between the two. *See, e.g., Goos v. Nat'l Ass'n of Realtors,* 715 F.Supp. 2, 3 (D.D.C.1989). Saunders has satisfied all three elements. First, she filed a lawsuit. Second, GWU denied her request for conversion. Third, members of the Department not only levelled serious and unfounded charges of academic dishonesty against her; one of them has also admitted that she would have voted for Saunders but for the filing of this suit.[6]

Saunders is not, however, likely to succeed on her claim that she was improperly denied promotion. It appears likely that GWU will show that even if Saunders had been denied promotion to full professor due to racial animus or retaliatory motive, she would nonetheless not have been promoted because of her insufficient time in rank. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989). It is also unlikely that Saunders will prove that Vice–President French's decision in 1990 not to allow consideration of her request for conversion was motivated by either racial animus or retaliatory motive.

### III.

Saunders has also shown a threat of irreparable injury absent injunctive relief. She has provided unrebutted evidence that the harm to her career and professional reputation from a interruption in service would be irreparable. As Dr. Cunningham explains, "[u]niversity professors and administrators recruiting new faculty are busy people, and I think it unlikely that many would take the time necessary to become familiar with the facts surrounding any period of unemployment." Third Cunningham Affidavit ¶ 5. As a consequence, even if Saunders were to prevail on the merits, the fact that she had an interruption in her employment would "always cast a cloud, even if she [were] ultimately reinstated through judicial process." Thus, for example, "[i]n a search process where two or more candidates have credentials of similar strength otherwise, a candidate with an unexplained career interruption is likely to be dropped from further consideration." *Id.* GWU responds that courts routinely reduce damage to reputation into dollar amounts. Everything about Saunders' life, however, suggests that damages would not compensate her for lost career opportunities. An educator since 1959, Saunders obviously does not teach merely to make money: Indeed, she transferred to GWU despite a cut in pay. She teaches instead because of the "tremendous personal satisfaction and joy" that she derives from teaching. *Chalk v. U.S. District Court, Central District,* 840 F.2d 701, 709 (9th Cir.1988). Thus, if her employment and her career advancement were interrupted, Saunders would lose the opportunity to gain a satisfaction that cannot be adequately compensated by a damages award. *See id.* Accordingly, Saunders has shown that she will be irreparably injured absent preliminary injunctive relief.

---

**4.** *See* Lilly Affidavit ¶ 2; First Saunders Affidavit, ¶ 5; *id.* Exhibit 1 & 2; Plaintiff's Statement of Material Facts, Exhibits 8 & 9; Wooldridge Deposition at 22, 45; Memorandum from Annie Wooldridge to Dr. Martha Burns, January 18, 1989 (Smith Deposition, vol. 3, GS–58, at 70).

**5.** *See* First Cunningham Affidavit ¶ 3; Greenberg Affidavit ¶ 10; Holmes Affidavit ¶ 4; Boswell Deposition at 367; Burns Deposition at 247.

**6.** *See, e.g.,* Greenberg Affidavit ¶¶ 7, 11; Fourth Saunders Affidavit, Exhibits 1–12.

### IV.

GWU contends that it would be significantly harmed if an injunction required it to keep Saunders on the faculty. Specifically, the University alleges that Saunders has fomented dissension in the School by seeking to enlist the support of the faculty in a petition drive. While it is undoubtedly true that this controversy has created divisions within the Department and the School, no evidence or argument presented by GWU suggests that these divisions would be healed simply by removing Saunders. The petition drive among the faculty of the School would not have stirred up a conflict if there were not faculty members who already felt that Saunders should stay at the School. Her termination or nonrenewal may fan the flames of controversy rather than extinguish them. Thus, it does not appear that denial or granting of a preliminary injunction will affect whatever emotions have been generated by this matter.

Moreover, even if granting the injunction did stir up more conflict, that conflict is unlikely to harm the School seriously. Saunders has been openly at odds with her Department since she filed an internal race discrimination claim in December, 1988. Yet during the past three years, the School has been able to function. Moreover, it is strange for a university to seek protection from heated debate over any matter, especially one so serious as discrimination.

In the alternative, GWU charges that Saunders has attempted to use her position to harm the Department and the program on educational administration. Specifically, it observes that Saunders has written a critical "self study" of the program which threatens its accreditation. See Self Study (Heddesheimer Declaration, Exhibit B). Saunders is not, however, the only author of the study: Professors McDonald and Willett are the second and third authors. Moreover, Saunders has not surreptitiously sent this study to accreditors. Quite to the contrary, the self study was submitted to School officials for comments. See Memorandum from Jay Shotel to Deloris Saunders, Jane McDonald, and Henry Willett, March 19, 1991 (Heddesheimer Declaration, Exhibit B). Most fundamentally, GWU has failed to indicate anything malicious in the study. The most serious criticism of the program is that it has one fewer faculty member than the accreditation standards require. See Self Study at 1. The Study also criticize the Chairman of the Department for his indifference towards the program and lack of support for it, see id at 1, 9, but it was clear from her testimony that Dr. McDonald shares that sentiment with Saunders. Thus, there is nothing in the self study report to suggest that GWU would suffer if Saunders were granted the injunctive relief that she seeks.

GWU also alleges that in submitting course schedules to the chairman, Saunders neglected to submit summer courses for McDonald and submitted courses for herself instead. See Second Smith Affidavit ¶ 2. The university does not, however, explain when this incident occurred or whether it was motivated by Saunders' well-founded belief that she would succeed in this litigation. Given the lack of factual foundation for GWU's other factual assertions, little weight can be attached to this evidence.

Finally, GWU argues that injunctive relief would impose a financial burden upon it because it has already hired professors to replace Saunders. It is not, however, clear whether the university would have to pay Saunders during the summer because she is not currently teaching any classes. Moreover, since there is a strong likelihood that Saunders will prevail in this matter, GWU would have to compensate Saunders for any salary lost pending resolution of this matter.

Thus, preliminary injunctive relief would impose only a minimal burden upon GWU.

### V.

The public interest in granting injunctive relief is, by contrast, quite strong. Although judicial interference in the internal affairs of universities may often affect the free exchange of ideas necessary for academic freedom and achievement, discrimination on the basis of one's skin color is the very antithesis of the liberal discourse and dialogue upon which the idea of the university is founded. Moreover, the public's

overriding interest in preventing discrimination justifies any inadvertent chill judicial interference may cause. *See, e.g., University of Pennsylvania v. Equal Employment Opportunity Comm'n,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). That public interest is especially compelling where, as here, a plaintiff has acted as one of only a few role models for blacks in the School. *Cf. Wygant v. Jackson Bd. of Education,* 476 U.S. 267, 315, 106 S.Ct. 1842, 1868, 90 L.Ed.2d 260 (1986) (Stevens, J., dissenting).

## VI.

■ Balancing these factors, it is clear that preliminary injunctive relief is warranted. Discrimination is often difficult to prove, but in this case the evidence currently before the Court indicates a substantial likelihood that Saunders will prove numerous violations of § 1981. It is even more probable that she will prove that her request for conversion was denied in 1989 in retaliation for filing this suit. Furthermore, there is a significant threat of irreparable injury because a break in Saunders' employment with the university will harm her academic reputation in a manner that damages cannot compensate. Finally, the balance of harms weighs strongly in favor of injunctive relief: While granting an injunction would create little additional dissension in the School and impose minimal financial burdens upon GWU, denial of the injunction would thwart society's interest in rooting out discrimination and frustrate its interest in encouraging successful blacks to act as role models.

■ As a final line of defense, GWU argues that Saunders does not deserve equitable relief because of her own laches and her "unclean hands." Saunders, however, filed her motion for a preliminary injunction only after trial, which was originally scheduled to conclude before the expiration of her contract with GWU expired, was continued. Similarly, although GWU has criticized her resume as lacking candor, Saunders has adequately answered each particular criticism. Finally, the accusation that Saunders attempted to help a former student to cheat on her comprehensive examination is entirely lacking in credibility.

## VII. Conclusion

Accordingly, the accompanying order will grant Saunders' motion for a preliminary injunction and require GWU to reinstate Saunders until trial in this matter is completed.

## ORDER

For the reasons stated in the accompanying memorandum and for reasons to be stated in a forthcoming memorandum on defendant's motion for summary judgment and in supplemental findings of fact, it is this 20th day of June, 1991, hereby

ORDERED: that plaintiff's Motion for a Preliminary Injunction should be, and is hereby, granted; and it is further

ORDERED: that defendant the George Washington University is hereby enjoined and directed to retain or reinstate plaintiff in or at an Associate Professor position in the School of Education and Human Development's Department of Educational Leadership under the same terms and conditions of employment and with the same responsibilities as previously; and it is further

ORDERED: that Defendant's Motion for Summary Judgment should be, and is hereby, granted as it relates to plaintiff's claims under 42 U.S.C. § 1981 for retaliation and for failure to renew her contract; and it is further

ORDERED: that Defendant's Motion for Summary Judgment should be, and is hereby, denied as it relates to all other claims.

## APPENDIX

United States District Court

For The District of Columbia

Deloris M. Saunders, Plaintiff,

v.

THE GEORGE WASHINGTON UNIVERSITY, Defendant.

Civil Action No. 89–2631–LFO

FINDINGS OF FACT IN SUPPORT OF PRELIMINARY INJUNCTION

An Order of January 20, 1991, granted plaintiff's motion for a preliminary injunction. The accompanying memorandum de-

termined that preliminary injunctive relief was appropriate based upon the reasoning in that memorandum, a forthcoming memorandum on defendant's motion for summary judgment, and forthcoming findings of fact. These are those findings.

1. Dr. Deloris Saunders is black.

2. She is currently an associate professor at George Washington University ("GWU") in the Department of Educational Leadership (the "Department") of the School of Education and Human Development (the "School"). Since moving to the Department from Howard University in 1985, Saunders has coordinated the Department's program in educational administration and policy studies, the second largest program in the School.[1]

3. Although the previous coordinator of that program was a tenured full professor, Saunders was originally hired as an assistant professor on a three-year, non-tenure-accruing contract.[2]

4. In 1986, Saunders requested and received a promotion to associate professor.[3]

In October, 1987, she requested that a tenure track position be created in the program in educational administration and that her position be converted from contract to tenure-accruing status.[4] At their fall personnel meeting, the tenured faculty of the Department deferred consideration of these requests; at the spring meeting they did so again.[5] In the fall of 1988, Saunders renewed both requests.[6] By a five-to-four vote, the Department recommended that a tenure-accruing position be created in the program on educational administration, but refused to convert Saunders' position from contract to tenure-accruing status.[7] In October, 1990, Saunders again requested conversion.[8] After initially deferring consideration of this request, the Department again denied it by the same five-to-four margin.[9] In the spring of 1990, the Department voted 5–4 not to renew Saunders' contract when it expired on May 31, 1991.[10] In the fall of 1990, Saunders applied for conversion a final time, but Roderick French, GWU's Vice–President for Academic Affairs, indicated that the University had already decided to sever its relationship with Saunders.[11]

1.  See Letter from Roderick S. French to Dr. Deloris M. Saunders, June 4, 1985 (Wooldridge Affidavit, Exhibit 1); Lilly Affidavit ¶ 3; Memorandum from Deloris M. Saunders, Ph.D., to The Faculty, Department of Educational Leadership, October 20, 1987 (Wooldridge Affidavit, Exhibit 6) (attachment).

2.  See Letter from Roderick S. French to Dr. Deloris M. Saunders, June 4, 1985.

3.  See Letter from Roderick S. French to Dr. Deloris M. Saunders, March 31, 1987 (Wooldridge Affidavit, Exhibit 5); Letter from Deloris M. Saunders, Ph.D., to The Faculty, Department of Education, October 6, 1986 (Wooldridge Affidavit, Exhibit 3).

4.  See Memorandum from Deloris M. Saunders to Dr. George Smith, October 20, 1987 (Wooldridge Affidavit, Exhibit 6); Memorandum from Deloris M. Saunders, Ph.D., to the Faculty, Department of Educational Leadership, October 20, 1987.

5.  See Memorandum from George W. Smith to Dr. Deloris Saunders, March 28, 1988 (Wooldridge Affidavit, Exhibit 8); Memorandum from George W. Smith to Dr. Deloris Saunders, November 23, 1987 (Wooldridge Affidavit, Exhibit 7).

6.  See Memorandum from Deloris M. Saunders to Faculty, Department of Educational Leadership, September 22, 1988 (Wooldridge Affidavit, Exhibit 11); Memorandum from Deloris M. Saunders to Faculty, Department of Educational Leadership, September 21, 1988 (Wooldridge Affidavit, Exhibit 10).

7.  See Memorandum from George W. Smith to Deloris Saunders, October 24, 1988 (Wooldridge Affidavit, Exhibit 13); First Smith Affidavit ¶ 2.

8.  See Memorandum from Deloris Muldrow Saunders to The Faculty, Department of Educational Leadership, October 6, 1989 (Wooldridge Affidavit, Exhibit 28).

9.  See Memorandum from George W. Smith to Dr. Deloris Saunders, December 12, 1989 (Wooldridge Affidavit, Exhibit 31); First Smith Affidavit ¶ 2.

10.  See Memorandum from George W. Smith to Dr. Deloris Saunders, April 23, 1990 (Wooldridge Affidavit, Exhibit 33); First Smith Affidavit ¶ 2.

11.  See Letter from Roderick S. French to Dr. Deloris M. Saunders, October 5, 1990 (Wooldridge Affidavit, Exhibit 38).

5. Conversion from contract status to a tenure-accruing position would have fundamentally changed the nature of Saunders' employment with GWU. Although the ultimate decision to grant tenure is more than a mere formality, in the School of Education and Human Development faculty members appointed to tenure-accruing positions almost always achieve tenure.[12] For that reason, the tenured faculty of the Department treated Saunders' requests for conversion as requests for tenure.[13] Tenure would have significantly changed Saunders' status vis-a-vis GWU: Rather than being subject to periodic decisions whether to renew her contract, Saunders would have essentially been guaranteed employment for life by the university.

6. Saunders is and was qualified for the teaching duties of a tenure professor.[14] Moreover, under School policy, she was eligible for conversion to tenure-accruing status.[15]

7. GWU contends that Saunders is unqualified because she lacks honesty and integrity. These contentions, raised for the first time after this complaint was filed, are without foundation. It is undisputed that Saunders was trustworthy enough to advise doctoral students and to teach other graduate students, and Saunders has presented credible witnesses and affidavits attesting to her reputation for high academic standards. Indeed, when not attacking her integrity, GWU has criticized Saunders as difficult precisely because of those standards. Most fundamentally, the evidence adduced so far has not supported the specific charges leveled by GWU.

a. Primarily, GWU contends that on her resume Saunders misrepresented her publication record. Specifically, GWU observes that the resume contains many works yet to be published. Those works are, however, clearly identified as pending, and it is a standard practice in academia to do so.[16] Moreover, it is undisputed that each of the listed works has been accepted for publication.[17] Finally, there is persuasive expert opinion that her resume was not deceptive.[18] While at GWU there was an administrative error with regard to her resume, but that incident is not likely to sustain GWU's challenge to Saunders' integrity.[19]

b. GWU also criticizes Saunders for listing the Woodrow Wilson Fellowship and an advanced study fellowship at the University of Illinois on her resume when she in fact did not accept those fellowships. By doing so, GWU contends, Saunders suggests that she "had been the beneficiary of those valuable professional experiences."[20] The fellowships are not, however, listed under Saunders' educational or professional record where one would naturally look for valuable professional experiences. Instead, the fellowships are listed under "special awards," along with items such as outstanding service awards and biographical entries in *Outstanding Personalities of the Midwest*. Thus, the resume indicates that the fellowships were awards, which is a reasonable way to record a fellowship offered but not accepted.

---

**12.** *See* First French Declaration ¶ 2; Greenberg Affidavit ¶ 12; Holmes Affidavit ¶ 5; Lilly Affidavit ¶ 8; Paratore Affidavit ¶ 7.

**13.** *See* Holmes Affidavit ¶ 6; *see also* Memorandum from George W. Smith to Dr. Deloris Saunders, November 23, 1987 (referring to her request for conversion as a "proposal to be granted tenure"); Memorandum from George W. Smith to Deloris Saunders, October 24, 1988 (same).

**14.** *See* Resume (Heddesheimer Declaration, Exhibit C); First Cunningham Affidavit ¶ 2; First French Declaration ¶ 6; Greenberg Affidavit ¶ 2; Holmes Affidavit ¶ 2; Paratore Affidavit ¶ 2; Rashid Deposition at 57.

**15.** *See* Memorandum from Roderick S. French to George Smith, November 30, 1989 (Plaintiff's Opposition, Exhibit 1); Memorandum from Jay R. Shotel to Dr. George Smith, March 9, 1988 (Smith Deposition, Vol. 1, GS–11, at 32).

**16.** *See* First Cunningham Affidavit ¶ 4.

**17.** *See* Fourth Saunders Affidavit, Exhibits 1–12.

**18.** *See* Third Cunningham Affidavit ¶ 7.

**19.** *See* Memorandum from Henry E. Hankerson to Dr. Deloris M. Saunders, December 10, 1985 (Saundra Smith Deposition, Exhibit 11).

**20.** Second French Declaration ¶ 8.

c. GWU further criticizes Saunders for representing that she had been recommended for tenure at Howard University. It is clear that she was never formally recommended for tenure.[21] There is, however, no evidence that Saunders ever misrepresented her status at Howard to advance her career. She does not list the recommendation on her resume: She mentioned the recommendation during a deposition in this case.[22] More importantly, Saunders has provided evidence supporting her statement.[23]

d. Finally, GWU accused Saunders of helping a student to cheat on her exams. In particular, Dr. Denise Baltimore, a former doctoral student of Saunders, testified that in 1988 Saunders gave her the questions on her comprehensive examination before the examination and urged Baltimore to hand in answers written beforehand. Comprehensive examinations are, however, proctored at GWU, and even Baltimore admitted on the stand that the suggested scheme would have failed. Baltimore attempted to explain away this problem by suggesting that Saunders was trying to entrap her. This story was, however, not corroborated. Although Baltimore claimed to have had documentary evidence, she testified that she had destroyed this evidence this spring. Moreover, Baltimore's testimony was contradicted by Saunders, by Dr. Margaret Scott, and even at points by Dr. McDonald, to whom Baltimore had related her charges and who attempted to vouch for Baltimore's veracity. Most fundamentally, Baltimore's hostility towards Saunders, her demeanor on the stand, and the internal contradictions in her testimony undermined her credibility. As a consequence, GWU is not likely to prevail on any defense based upon Baltimore's allegations.

e. Thus, despite the number of allegations of dishonesty brought by the University, upon analysis none of them cast doubt upon Saunders' integrity nor in any way undermine the evidence of her qualifications.

8. The program on Educational administration needed a tenure track position at the time of Saunders' requests.[24] Moreover, although a moratorium was placed upon conversions to tenure-accruing status in August of 1988,[25] that moratorium did not prevent the various departments at GWU from recommending faculty for conversion, and, given GWU's policy of deferring to Departmental personnel decisions, it appears that the moratorium would only have delayed, but not blocked, such recommendations.[26]

9. Saunders was not, however, eligible for promotion to full professor. The School has a five year time-in-rank requirement for promotion to full professor of five years.[27] Although a similar time-in-rank requirement was waived when Saunders was promoted to associate professor, Saunders has not presented enough evidence to make it substantially likely that she will prove her eligibility for promotion to full professor at trial.

10. By contrast, Saunders will likely prove that the justifications offered for deferring her request for conversion in the fall of 1987 and the Spring of 1988 were pretextual. In the fall of 1987, George Smith, the chairman of the Department,

21. *See* Saundra Smith Deposition at 28–34; *id.* (Exhibit 2).

22. *See* Saunders Deposition at 55.

23. *See* Memorandum from Henry E. Hankerson to Dr. Deloris Saunders, March 9, 1984 (Second Saunders Affidavit, Exhibit 9); *see also* Deposition of Dr. Saundra Smith at 28–34 (indicating that the handwriting on the memorandum is authentic).

24. *See* Memorandum from Martha Burns to Anne Wooldridge, January 12, 1989 (Smith Deposition, vol. 3, GS–39, at 7); Memorandum from George W. Smith to Deloris Saunders, October 21, 1988.

25. *See* Trachtenberg Affidavit ¶ 2.

26. Memorandum from Roderick S. French to George Smith, November 30, 1989; French Deposition at 125–26.

27. *See* Policies and Procedures on Appointment, Tenure, and Promotion as Revised by SEHD Faculty on August 27, 1985 ¶ E(3) (Wooldridge Affidavit, Exhibit 42).

questioned whether enrollment in the program on educational administration was large enough to support a tenure track position.[28] Based upon that concern, the Department deferred consideration of Saunders' request.[29] The program on educational administration had, however, supported a tenured position for Saunders' predecessor, and since Saunders' arrival the program had grown.[30] Moreover, enrollment information was easily available through the University's Office of Institutional Research.[31] Thus, it does not appear that Smith questioned the enrollment in the educational administration program because he harbored any real doubts as to whether the program could support a tenured professor. Instead, he raised the question because he had no credible basis for directly opposing Saunders' request at that point.[32]

The subsequent deferral of Saunders' request in the spring of 1988 was even more suspect. Before the Department's personnel meeting, the acting Dean of the School wrote to Smith that the educational administration program had "considerable enrollments," that Saunders was "eligible for conversion based upon her date of employment," and that the Department should act quickly because a new "tenure track line will become available in the next 60 days."[33] Smith never informed the other members of the Department of the acting Dean's comments.[34] Instead, he continued to state that there were concerns about enrollment.[35] Smith also argued that the conversion decision should be deferred until the new dean could be consulted because he was an expert on policy studies.[36] The new Dean has no expertise in policy studies.[37]

Thus, there is strong and as-yet unrebutted evidence that the justifications offered for deferring Saunders' request for conversion in the fall of 1987 and the spring of 1988 were pretextual.

11. There is also strong and unrebutted evidence of a pattern of discrimination in the Department. The Faculty of the School is overwhelmingly white, and Saunders is the only black in her Department.[38] In its history the School has had only two tenured black faculty members,[39] and one of those two, Saunders' predecessor, left the University because he felt that his white colleagues became hostile to him when he sought a promotion.[40] In addition, in 1985 the Department advertised Saunders' position in *The Chronicle of Higher Education* at a "[s]alary commensurate with experience and education"; the same position was advertised in *The National Minority Campus Chronicle* at a flat salary of $25,000.[41] The Department later offered a black candidate for a contract position in the Department only $30,000, while the white woman who eventually assumed the post was able to "negotiate" a salary of $38,000.[42] Finally, when Saunders was seeking conversion and only one tenure track position was available in the program on educational administration, the Department submitted an advertisement for a new

---

**28.** *See* Greenberg Affidavit ¶ 3.

**29.** *See* Memorandum from George W. Smith to Dr. Deloris Saunders, November 23, 1987.

**30.** *See* Greenberg Affidavit ¶ 3; Lilly Affidavit ¶ 3.

**31.** *See* Paratore Affidavit ¶ 3.

**32.** *See* Rashid Deposition at 57.

**33.** Memorandum from Jay R. Shotel to Dr. George Smith, March 9, 1988.

**34.** *See* Holmes Affidavit ¶ 9; Paratore Affidavit ¶ 5.

**35.** *See* Memorandum from George W. Smith to Professors Brown, Saunders, and Willett, May 5, 1988 (Smith Deposition, Vol. 1, GS–15, at 39).

**36.** Memorandum from George W. Smith to Dr. Deloris Saunders, March 28, 1988.

**37.** *See* Leonard Deposition at 181–82.

**38.** *See* Holmes Affidavit ¶ 8.

**39.** *See* Lilly Affidavit ¶ 2.

**40.** *See id.* ¶ 4.

**41.** First Saunders Affidavit, Exhibit 1 & 2.

**42.** Plaintiff's Exhibits 8 & 9.

position in the program to the University's equal employment opportunity officer with the indication that the position was to be tenure track removed.[43]

12. There is also evidence that George Smith, chairman of the Department, discriminated against Saunders on the basis of her race. In 1987, Smith and Saunders were serving on the dissertation committee for one Valeria Baylor. Saunders thought Baylor's dissertation to be inadequate; Smith disagreed. Saunders submitted the Baylor dissertation to other professors who agreed that it was inadequate.[44] At a subsequent meeting with Baylor, Smith berated Saunders in front of the student and another professor and later used his administrative authority to serve petty indignities upon Saunders.[45] Although Saunders had occasional differences of opinion on professional matters with her colleagues at Howard, her academic views did not excite such hostility there.[46] Moreover, Smith did not act this way towards his white colleagues when he had a conflict with them. Quite to the contrary, Smith was nonconfrontational to the point of avoiding some colleagues for months after an argument.[47] This unusual behavior led the Dean of the School and its equal employment opportunity officer to conclude that Smith had racist tendencies.[48] That testimony has not been disputed or in any way contradicted. Accordingly, it appears that Saunders will prove at trial that Smith acted more vindictively towards Saunders after their argument than he would have if she had been white.

13. In light of the evidence of the pretextual nature of the Department's decision to defer consideration of Saunders' request for conversion, the pattern of discrimination in the Department, Smith's own racist tendencies, and his influence as the chairman on the proceedings, Saunders is likely to prove that the deferral of her request for conversion in the fall of 1987 and again in the spring of 1989 was motivated by, and due to, racial animus.

14. For similar reasons, Saunders is likely to show that the denial of her request for conversion in the fall of 1988 was discriminatory. Writing for the Department, Smith explained that the decision was based upon four areas of concern:

1. The faculty feels that a problem exists in your listening to and working with your colleagues.

2. They perceive a problem in your failing to work administratively with the Department Chair.

3. The manner in which the LEAD project was negotiated was considered unprofessional.

4. Informing the Dean and the Chair of an anticipated absence and the list of instructors to teach classes only a few days in advance was also considered unprofessional.[49]

Although Saunders has charged that these criteria were not legitimate, GWU has failed to provide evidence indicating that they were or that such reasons ever before served as the basis for denying conversion to a qualified individual. In light of the evidence of a pattern of discrimination in the Department, Smith's racial animus to-

---

**43.** *See* Memorandum from Annie Wooldridge to Dr. Martha Burns, January 18, 1989 (Smith Deposition, vol. 3, GS–58, at 70); Memorandum from Annie Wooldridge to Dr. Martha Burns, January 12, 1989 (Smith Deposition, vol. 3, GS–41, at 28); Memorandum from Martha Burns to Annie Wooldridge, January 12, 1989 (Smith Deposition, vol. 3, GS–39, at 7).

**44.** *See* Memorandum from Carol Hoare to Deloris Saunders, June 8, 1987 (Smith Deposition, vol. 1, GS–7, at 22); Memorandum from Martha Rashid to Professor Saunders, June 3, 1987 (Smith Deposition, vol. 1, GS–6, at 20).

**45.** *See* Memorandum from Harriet Hunter–Boykin, Ed.D., to Abe Weissbrod[t], April 23, 1990,

at 2 (Smith Deposition, vol. 1, GS–5, at 18); *see also* Letter from Deloris Saunders to Annie Wooldridge, December 8, 1988 (Wooldridge Affidavit, Exhibit 19).

**46.** *See* Saundra Smith Deposition at 22–26.

**47.** *See* Smith Deposition at 87.

**48.** *See* Wooldridge Deposition at 22, 45; *see also* Fed.R.Evid. 801(d)(2)(D).

**49.** Memorandum from George W. Smith to Dr. Deloris Saunders, December 6, 1988.

wards Saunders, and the dubiousness of the justifications offered by the Department, Saunders is likely to prove at trial that those justifications were a pretext for discrimination.

15. The reasons given for denying Saunders' 1989 request for conversion are also likely to be found to be pretextual. On December 12, 1989, the Department denied her request primarily on the ground of insufficient publications.[50] Saunders, however, had an extremely heavy work load.[51] There is persuasive expert opinion that, given these responsibilities, it was not reasonable to expect her to publish more.[52] Two of the five members of the committee voting to deny her conversion have since testified that her publication record was adequate.[53] More fundamentally, there is unrebutted testimony that the Department has never before concerned itself with publication records.[54] It is therefore likely that Saunders will prove that lack of publications was not the true reason for the Department's denial of Saunders' request in 1989.

16. Given the pattern of discrimination in the Department and the evidence of Smith's racial animus towards Saunders, it again appears that the denial of Saunders' request for tenure was motivated by racial animus.

17. Saunders will also likely convince the jury that denial of her request in 1989 was motivated by an intent to retaliate against Saunders for filing this suit. Saunders filed her original complaint in September, 1989. Two months later, Smith and Burns levelled serious and unfounded charges of academic dishonesty against Saunders concerning the publications on her resume.[55] This sequence clearly suggests that the Department was "upping" the ante because Saunders filed this suit. More fundamentally, there is unrebutted evidence that one of the members of the Department who voted against Saunders admitted that she would have voted for Saunders but for the filing of this suit.[56] Given this evidence and GWU's failure to provide any evidence to the contrary, Saunders is likely to prove that at least some of the members of the Department who voted against her request for conversion and for promotion in 1989 were intent upon punishing her for filing this suit.

18. In the spring of 1990, the Department voted not to renew Saunders' contract when it expired on May 31, 1991. In his letter explaining that decision, Smith noted that some members of the committee were worried that Saunders had failed to explain apparent discrepancies in her resume, others were worried about her failure to publish articles in a refereed journal, still others were worried about her administration of the LEAD project, and, finally, some expressed concerns about her teaching credentials.[57] Here again, there is evidence that some of these concerns were pretextual. Saunders has explained each purported discrepancy in her resume and the failure of the Department to give her an opportunity to do so again casts doubt upon the sincerity of this ground for not renewing her contract. Moreover, it is clear that her degree in General Educational Administration from the University of Michigan qualified her to teach in the program on educational administration. Thus, given the previous evidence of discrimination and of retaliatory intent, it appears likely here as well that Saunders will prove at trial that the reasons offered by the Department were a pretext for discrimination and for retaliation.

---

50. *See* Memorandum from George W. Smith to Dr. Deloris Saunders, December 12, 1989.

51. *See, e.g.,* First Saunders Affidavit, Exhibit 4.

52. *See* First Cunningham Affidavit ¶ 3; Greenberg Affidavit ¶ 10; Holmes Affidavit ¶ 4.

53. *See* Boswell Deposition at 367; Burns Deposition at 247.

54. *See* Holmes Affidavit ¶ 4.

55. *See* Greenberg Affidavit ¶ 7.

56. *See id.* ¶ 11; *see also* Fed.R.Evid. 801(d)(2)(D).

57. *See* Memorandum from George W. Smith to Dr. Deloris Saunders, April 23, 1990.

19. In September of 1990, Saunders renewed her request for conversion based upon information discovered in this action.[58] Vice–President French responded that in light of the Department's decision that spring not to renew her contract, the Department's position on her retention at the university had already been expressed.[59] Saunders has not presented persuasive evidence that this justification was pretextual.

Date: June 28, 1991

/s/Louis F. Oberdorfer
United States District Judge

---

**58.** *See* Memorandum from Deloris M. Saunders to Tenured Faculty, Department of Educational Leadership, September 24, 1990 (Wooldridge Affidavit, Exhibit 37).

**59.** *See* Letter from Roderick S. French to Dr. Deloris M. Saunders, October 5, 1990.