**Timothy R. McVEIGH, Plaintiff,**

v.

**William S. COHEN, et al., Defendants.**

**No. CIV. A. 98–116.**

United States District Court, District of Columbia.

Jan. 26, 1998.

Amybeth Garcia–Bokor, Guerrieri, Edmond & Clayman, P.C., Washington, DC, Christopher Wolf, Alec W. Farr, Proskauer, Rose, Goetz & Mendelsohn, L.L.P., Washington, DC, for plaintiff.

## *MEMORANDUM OPINION*

SPORKIN, District Judge.

This matter comes before the Court on Plaintiff's Motion for a Preliminary Injunction. Plaintiff Timothy R. McVeigh, who bears no relation to the Oklahoma City bombing defendant, seeks to enjoin the United States Navy from discharging him under the statutory policy colloquially known as "Don't Ask, Don't Tell, Don't Pursue." *See* 10 U.S.C. § 654 ("new policy"). In the course of investigating his sexual orientation, the Plaintiff contends that the Defendants violated his rights under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2701 *et seq.*, the Administrative Procedure Act ("APA") 5 U.S.C. § 706, the Department's own policy, and the Fourth and Fifth Amendments of the U.S. Constitution. Absent an injunction, the Plaintiff avers that he

will suffer irreparable injury from the discharge, even if he were ultimately to prevail on the merits of his claims.

## STATEMENT OF FACTS

The Plaintiff, Senior Chief Timothy R. McVeigh, is a highly decorated seventeen-year veteran of the United States Navy who has served honorably and continuously since he was nineteen years old. At the time of the Navy's decision to discharge him, he was the senior-most enlisted man aboard the United States nuclear submarine U.S.S. *Chicago*.

On September 2, 1997, Ms. Helen Hajne, a civilian Navy volunteer, received an electronic mail ("email") message through the America Online Service ("AOL") regarding the toy-drive that she was coordinating for the *Chicago* crew members' children. The message box stated that it came from the alias "boysrch," but the text of the email was signed by a "Tim." Administrative Record ("AR") at 110. Through an option available to AOL subscribers, the volunteer searched through the "member profile directory" to find the member profile for this sender. The directory specified that "boysrch" was an AOL subscriber named Tim who lived in Honolulu, Hawaii, worked in the military, and identified his marital status as "gay." *See* AR at 111. Although the profile included some telling interests such as "collecting pics of other young studs" and "boy watching," it did not include any further identifying information such as full name, address, or phone number. However, on other occasions, Hajne had communicated with the Plaintiff about his participation in the drive.

Ms. Hajne proceeded to forward the email and directory profile to her husband, who, like Plaintiff, was also a noncommissioned officer aboard the U.S.S. *Chicago*. The material eventually found its way to Commander John Mickey, the captain of the ship and Plaintiff's commanding officer. In turn, Lieutenant Karin S. Morean, the ship's principal legal adviser and a member of the Judge Advocate General's ("JAG") Corps was called in to investigate the matter. By this point, the Navy suspected the "Tim" who authored the email might be Senior Chief Timothy McVeigh. Before she spoke to the Plaintiff and without a warrant or court order, Lieutenant Morean requested a Navy paralegal on her staff, Legalman First Class Joseph M. Kaiser, to contact AOL and obtain information from the service that could "connect" the screen name "boysrch" and accompanying user profile to McVeigh. *See* AR at 13. Legalman Kaiser called AOL's toll-free customer service number and talked to a representative at technical services. Legalman Kaiser did not identify himself as a Naval serviceman. According to his testimony at the administrative hearing, he stated that he was "a third party in receipt of a fax sheet and wanted to confirm the profile sheet, [and] who it belonged to." AR at 14. The AOL representative affirmatively identified Timothy R. McVeigh as the customer in question. *See id* at 11–15.

Upon verification from AOL, Lieutenant Morean notified Senior Chief McVeigh that the Navy had obtained "some indication[ ]" that he made a statement of homosexuality" in violation of § 654(b)(2) of "Don't Ask, Don't Tell." AR at 27–28. In light of the Uniform Code of Military Justice prohibition of sodomy and indecent acts, she then advised him of his right to remain silent.[1] *See id.* at 28, 30. Shortly thereafter, in a memorandum dated September 22, 1997, the Navy advised Plaintiff that it was commencing an administrative discharge proceeding (termed by the Navy as an "administrative separation") against him. The reason stated was for "homosexual conduct, as evidenced by your statement that you are a homosexual." AR at 107.

On November 7, 1997, the Navy conducted an administrative discharge hearing before a three-member board. At the hearing, the Plaintiff made an unsworn oral statement that explained the substance of his email to Ms. Hajne, and thus by inference confirmed

---

1. Plaintiff suggests that Lieutenant Morean acted inappropriately somehow when she advised Plaintiff of his rights at this time. The Court finds no merit to this claim. Given the state of the investigation against the Plaintiff, it was appropriate in all respects for Lieutenant Morean to have given Plaintiff a warning.

his authorship of the correspondence. *See* AR at 84. The Plaintiff presented evidence of a prior engagement to a woman and several other heterosexual relationships to rebut the presumption of homosexuality, pursuant to § 654(b)(2). *See* AR at 82–84. This evidence was rejected by the Board. At the conclusion of the administrative hearing, the board held that the government had sufficiently shown by a preponderance of the evidence that Senior Chief McVeigh had engaged in "homosexual conduct," a dischargeable offense.

The Navy accelerated Plaintiff's separation to take effect at 5:00 a.m. EST on Friday, January 16, 1998. On January 15, Plaintiff commenced this lawsuit and the government postponed his separation until Wednesday, January 20. This Court held a hearing on that Wednesday morning. There, the Navy initially declined to honor this Court's request for an additional amount of time to consider this matter. The Plaintiff was scheduled to be discharged on Friday, January 23. However, on January 22, the Navy extended the time for this Court to render a decision until Tuesday, January 27, when Plaintiff is now scheduled to be discharged barring relief from this Court.

## ANALYSIS

### STANDARD FOR PRELIMINARY INJUNCTION

■ To prevail on a request for preliminary injunction, the plaintiff must demonstrate 1) a substantial likelihood of success on the merits; 2) irreparable harm or injury absent an injunction; 3) less harm or injury to the other parties involved; and 4) the service of the public interest. *See Dendy v. Washington Hosp. Center*, 581 F.2d 990, 992 (D.C.Cir.1978) (footnote omitted); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). For the reasons set forth below, this Court concludes that the Plaintiff is entitled to the relief that he seeks at this time, a preliminary injunction barring his discharge.

### I. Substantial Likelihood of Success on the Merits

Plaintiff in this case demonstrates a likely success to prevail on the merits. At its core, the Plaintiff's complaint is with the Navy's compliance, or lack thereof, with its new regulations under the "Don't Ask, Don't Tell, Don't Pursue" policy. Plaintiff contends that he did not "tell," as prescribed by the statute, but that nonetheless, the Navy impermissibly "asked" and zealously "pursued."

In short, this case raises the central issue of whether there is really a place for gay officers in the military under the new policy, "Don't Ask, Don't Tell, Don't Pursue." Although there have been a series of challenges to the constitutionality of the statute that codifies the policy, *see e.g., Philips v. Perry*, 106 F.3d 1420 (9th Cir.1997); *Thomasson v. Perry*, 80 F.3d 915 (4th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 358, 136 L.Ed.2d 250 (1996); *Richenberg v. Perry*, 97 F.3d 256 (8th Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 45, 139 L.Ed.2d 12 (1997); *Able v. United States*, 88 F.3d 1280 (2d Cir. 1996), civil courts thus far have not interpreted the requirements of the statute assuming its constitutionality. The limits on the Navy's right to investigate sexual orientation and the restrictions on an officer's right to be a gay man or woman in the military—i.e., what it practically means not to ask, not to tell, and not to pursue—have yet to be litigated in the courts.

In 1993, leaders of Congress and the President reached a compromise designed to recognize the important role that officers who happen to be gay play in the defense of our nation. *See* Policy Concerning Homosexuality in the Armed Forces: Hearings Before the Senate Committee on Armed Services, 103d Cong. 595 *et seq.* (1993) (statements of General Colin Powell, Chair of the Joint Chiefs of Staff, Admiral David Jeremiah, Navy, and General Merrill McPeak, Air Force). While the heads of the Armed Forces expressed fear that unit cohesion and military preparedness would be compromised by openly gay conduct, they acknowledged that homosexuality itself was not necessarily incompatible with military service. The statute that came to embody this position, "Don't

Ask, Don't Tell, Don't Pursue," was specifically drafted to allow members of the military to live private lives as gay men and women, so long as their sexual orientation remained unspoken.

The facts as stated above clearly demonstrate that the Plaintiff did not openly express his homosexuality in a way that compromised this "Don't Ask, Don't Tell" policy. Suggestions of sexual orientation in a private, anonymous email account did not give the Navy a sufficient reason to investigate to determine whether to commence discharge proceedings. In its actions, the Navy violated its own regulations. *See* Guidelines for Fact–Finding Inquiries Into Homosexual Conduct, Department of Defense Directive No. 1332.14 ("Guidelines"). An investigation into sexual orientation may be initiated "only when [a commander] has received credible information that there is a basis for discharge," such as when an officer "has said that he or she is a homosexual or bisexual, or made some other statement that indicates a propensity or intent to engage in homosexual acts." *Id.* Yet in this case, there was no such credible information that Senior Chief McVeigh had made such a statement. Under the Guidelines, "credible information" requires more than "just a belief or suspicion" that a Service member has engaged in homosexual conduct. *Id.* In the examples provided, the Guidelines state that "credible information" would exist in this case only if "a reliable person" stated that he or she directly observed or heard a Service member make an oral or written statement that "a reasonable person would believe was intended to convey the fact that he or she engages in or has a propensity or intent to engage in homosexual acts." *Id.*

■ Clearly, the facts as stated above in this case demonstrate that there was no such "credible information." All that the Navy had was an email message and user profile that it suspected was authored by Plaintiff. Under the military regulation, that information alone should not have triggered any sort of investigation. When the Navy affirmatively took steps to confirm the identity of the email respondent, it violated the very essence of "Don't Ask, Don't Pursue" by

launching a search and destroy mission. Even if the Navy had a factual basis to believe that the email message and profile were written by Plaintiff, it was unreasonable to infer that they were necessarily intended to convey a propensity or intent to engage in homosexual conduct. Particularly in the context of cyberspace, a medium of "virtual reality" that invites fantasy and affords anonymity, the comments attributed to McVeigh do not by definition amount to a declaration of homosexuality. At most, they express "an abstract preference or desire to engage in homosexual acts." *See* Guidelines. Yet the regulations specify that a statement professing homosexuality so as to warrant investigation must declare "more than an abstract preference or desire"; they must indicate a likelihood actually to carry out homosexual acts. *Id.*

■ The subsequent steps taken by the Navy in its "pursuit" of the Plaintiff were not only unauthorized under its policy, but likely illegal under the Electronic Communications Privacy Act of 1986 ("ECPA"). The ECPA, enacted by Congress to address privacy concerns on the Internet, allows the government to obtain information from an online service provider—as the Navy did in this instance from AOL—but only if a) it obtains a warrant issued under the Federal Rules of Criminal Procedure or state equivalent; or b) it gives prior notice to the online subscriber and then issues a subpoena or receives a court order authorizing disclosure of the information in question. *See* 18 U.S.C. § 2703(b)(1)(A)–(B), (c)(1)(B).

In soliciting and obtaining over the phone personal information about the Plaintiff from AOL, his private on-line service provider, the government in this case invoked neither of these provisions and thus failed to comply with the ECPA. From the record, it is undisputed that the Navy directly solicited by phone information from AOL. Lieutenant Karin S. Morean, the ship's principal legal counsel and a member of the JAG corp, personally requested Legalman Kaiser to contact AOL and obtain the identity of the subscriber. *See* AR at 13. Without this information, Plaintiff credibly contends that the Navy could not have made the necessary

connection between him and the user profile which was the sole basis on which to commence discharge proceedings.

The government, in its defense, contends that the Plaintiff cannot succeed on his ECPA claim. It argues that the substantive provision of the statute that Plaintiff cites, 18 U.S.C. § 2703(c)(1)(B), puts the obligation on the online service provider to withhold information from the government, and not vice versa. In support of its position, Defendants cite to the Fourth Circuit opinion in *Tucker v. Waddell*, 83 F.3d 688 (4th Cir.1996), which held that § 2703(c)(1)(B) only prohibits the actions of online providers, not the government. Accordingly, Defendants allege that Plaintiff has no cause of action against the government on the basis of the ECPA.

Under the circumstances of this case, it is unlikely that the government will prevail on this argument. Section 2703(c)(1)(B) must be read in the context of the statute as a whole. In comparison, § 2703(a) and (b) imposes on the government a reciprocal obligation to obtain a warrant or the like before requiring disclosure. It appears from the face of the statute that all of the subsections of § 2703 were intended to work in tandem to protect consumer privacy. Even if, however, the government ultimately proves to be right in its assessment of § 2703(c)(1)(B), the Plaintiff has plead § 2703(a) and (b) as alternative grounds for relief. In his claim that the government, at the least, solicited a violation of the ECPA by AOL, the Court finds that there is likely success on the merits with regard to this issue. The government knew, or should have known, that by turning over the information without a warrant, AOL was breaking the law. Yet the Navy, in this case, directly solicited the information anyway. What is most telling is that the Naval investigator did not identify himself when he made his request. While the government makes much of the fact that § 2703(c)(1)(B) does not provide a cause of action against the government, it is elementary that information obtained improperly can be suppressed where an individual's rights have been violated. In these days of "big brother," where through technology and otherwise the privacy interests of individuals from all walks of life are being ignored or marginalized, it is imperative that statutes explicitly protecting these rights be strictly observed.

. The government has produced no evidence that would indicate that it would have proceeded without this information from AOL affirmatively linking the email to Senior Chief McVeigh. That the Plaintiff may have made incriminating statements at the subsequent administrative hearing does not bootstrap the Navy out of its legal dilemma of not only violating its own policy, but also a federal statute in its attempt to charge the Plaintiff with homosexuality.

In Plaintiff's case, this Court finds that the Navy has gone too far. The "Don't Ask, Don't Tell, Don't Pursue" policy was clearly aimed at accommodating gay men and women in the military. In effect, it was intended to bring our nation's armed forces in line with the rest of society, which finds discrimination of virtually every form intolerable. It is self-evident that a person's sexual orientation does not affect that individual's performance in the workplace. At this point in history, our society should not be deprived of the many accomplishments provided by people who happen to be gay. The "Don't Ask, Don't Tell, Don't Pursue" policy was a bow to society's growing recognition of this fact. For the policy to be effective, it has to be implemented in a sensitive, balanced manner. Under the policy as it stands today, gay service members must be permitted to serve their country honorably, so long as they are discrete in pursuing their personal lives.

In this case, the Plaintiff has had an exemplary service record for some seventeen years. Indeed, he has risen in the ranks to become the most senior non-commissioned officer on his ship. His evaluations have been of the highest order. Nothing has been produced before this Court which would in any way suggest that his sexual orientation has adversely affected his job performance. Senior Chief McVeigh's place in the Navy might even be characterized by some to be the very essence of what was hoped to be achieved by those who conceived the policy. The Plaintiff is no less an officer today than he was on January 5, 1998, the day before he

was told of his imminent discharge from the Navy because of his sexual orientation.

As this Court stated in *Elzie v. Aspin*, 897 F.Supp. 1, 3 (1995), it cannot understand why the Navy would seek to discharge an officer who has served his country in a distinguished manner just because he might be gay. Plaintiff's case "vividly underscores the folly ... of a policy that systematically excludes a whole class of persons who have served this country proudly and in the highest tradition of excellence." *Id.* at 4. Although this case specifically does not reach any of the constitutional issues underscoring the "Don't Ask, Don't Tell, Don't Pursue" policy, *see Able v. United States*, 968 F.Supp. 850 (E.D.N.Y. 1997), the Court must note that the defenses mounted against gays in the military have been tried before in our nation's history— against blacks and women. *See Elzie v. Aspin*, 841 F.Supp. 439, 443 (D.D.C.1993). Surely, it is time to move beyond this vestige of discrimination and misconception of gay men and women.

## II. Irreparable Harm

■ Without this Court's immediate intervention, the Plaintiff will lose his job, income, pension, health and life insurance, and all the other benefits attendant with being a Naval officer. Having served honorably for the last seventeen years, Plaintiff will be separated from a position which is central to his life on the sole ground that he has been labeled a "homosexual," and thus by definition unfit for service. The stigma that attaches to such an accusation without substantiation is significant enough that this Court believes it must grant the injunctive relief sought. In cases nearly identical to this, courts have accordingly granted a preliminary injunction, *see Elzie v. Aspin*, 841 F.Supp. 439, 443 (D.D.C. 1993) (loss of benefits and "rights as a Marine" constitute irreparable harm); *May v. Gray*, 708 F.Supp. 716, 719 (E.D.N.C.1988) (same); *see also Saunders v. George Washington University*, 768 F.Supp. 843, 845 (D.D.C.1991); *Huynh v. Carlucci*, 679 F.Supp. 61, 67 (D.D.C.1988).

## III. Harm to other Parties

■ In contrast to the serious injury that Plaintiff immediately faces if discharged, there is no appreciable harm to the Navy if Senior Chief McVeigh is permitted to remain in active service. Indeed, the Navy will only be enhanced by being able to retain the Plaintiff's seventeen years of service experience.

## IV. Public Interest

■ Certainly, the public has an inherent interest in the preservation of privacy rights as advanced by Plaintiff in this case. With literally the entire world on the world-wide web, enforcement of the ECPA is of great concern to those who bare the most personal information about their lives in private accounts through the Internet. In this case in particular, where the government may well have violated a federal statute in its zeal to brand the Plaintiff a homosexual, the actions of the Navy must be more closely scrutinized by this Court. It is disputed in the record exactly as to how the Navy represented itself to AOL when it requested information about the Plaintiff. The Defendants contend that Legalman Kaiser merely asked for confirmation of a fax sheet bearing Plaintiff's account. Plaintiff contends, and AOL confirms, however, that the Naval officer "mislead" AOL's representative by "both failing to disclose the identity and purpose [of his request] and by portraying himself as a friend or acquaintance of Senior Chief McViegh's." *See* AOL Statement on the Matter of Timothy McVeigh, Ct. Ex. 1. At the final injunction hearing, this issue should be fully explored.

The Court believes that when this case is finally determined, it will become clear that the case will be able to be disposed on the basis of the "Don't Ask, Don't Tell, Don't Pursue" policy. This provision draws a fine balance between the interests of gay service members and the Armed Forces. It is a way of permitting gay women and men to serve in the Armed Forces, a right that the military did not provide them prior to the adoption of "Don't Ask, Don't Tell, Don't Pursue."

To make the policy work requires each of the parties to refrain from taking certain actions. Under the provisions of the policy, if the gay member agrees to remain silent about his or her sexual orientation, he or she

is permitted to serve. For its part under the policy, the military is required to refrain from asking any of its members about their sexual orientation or pursuing an inquiry into a member's sexual orientation without a reasonable basis in fact. So far, pursuant to the record developed in this case, while Plaintiff complied with the requirements imposed upon him under "Don't Ask, Don't Tell, Don't Pursue," the Defendant went further than the policy permits. Although Officer McVeigh did not publicly announce his sexual orientation, the Navy nonetheless impermissibly embarked on a search and "outing" mission. Therefore, when this case is finally heard, if the record remains as it is now, the Plaintiff will likely prevail. It is accordingly for this reason that a preliminary injunction will issue. An appropriate order follows.

### ORDER

For the reasons set forth in the opinion above, it is hereby

**ORDERED** that good cause having been shown pursuant to Rule 65 of the Federal Rules of Civil Procedure that immediate and irreparable injury and damage will result to Plaintiff before a trial on the merits can be heard and decided, that Plaintiff's Motion for a Preliminary Injunction is **GRANTED**; and it is

**FURTHER ORDERED** that Defendants, their officers, agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of the Order by personal service or otherwise, shall be preliminarily enjoined from taking any adverse action against Plaintiff, including discharging Plaintiff from the United States Navy or otherwise hindering Plaintiff's Naval Service, on the basis of his alleged sexual orientation pending final resolution of Plaintiff's Complaint; and it is

**FURTHER ORDERED** that the parties shall appear before this Court on January 29, 1998 at 10:00 in Courtroom 6 for a status conference, at which time a briefing schedule.

and date for a hearing on final injunctive relief will be determined.