36 F.Supp.2d 430 (1999)
In re Application of the UNITED STATES of America for an Order Pursuant to 18 U.S.C. 2703(d).
No. Civ.A. 99-10015-MBD.
United States District Court, D. Massachusetts.
February 9, 1999.
*431 Jeanne M. Kempthorne, United States Attorney's Office, Boston, MA, for USA, petitioner.
Cameron F. Kerry, Scott Samuels, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Cablevision Systems Corp., respondent.

MEMORANDUM
YOUNG, District Judge.
The United States (the "Government") has applied for an order (the "Application"), pursuant to 18 U.S.C. § 2703(d), directing a media and communications company (the "Company") to disclose narrowly specified information to the Government regarding certain of its customers. Although the Company does not oppose the Application, and although both the Company and the Government have requested that the order be issued under seal, the Court releases this memorandum to highlight a thorny and important issue raised by the Application.

I. The Statutory Scheme

A. Cable Communications Policy Act of 1984
In 1984, Congress enacted the Cable Communications Policy Act (the "Cable Act") now codified in Title 47. See 47 U.S.C. §§ 521, et seq. One of the many goals of the Cable Act was to "create[ ] a nationwide standard for the privacy protection of cable subscribers." H.R.Rep. No. 98-934, pt. IV, at 76 (1984) reprinted in 1984 U.S.C.C.A.N. 4655, 4713. Thus, section 551 of Title 47 contains rules regarding the limited circumstances under which "personally identifiable information" about customers may be released by a cable operator for various purposes, including use by the Government. See 47 U.S.C. § 551(c). Specifically, when the Government seeks information from a cable operator, the Government must apply for a court order and offer clear and convincing evidence that the customer is suspected of engaging in criminal activity and that the information sought would be material evidence in the case. See 47 U.S.C. § 551(h)(1). Moreover, whenever the Government seeks information relative to a cable operator's customer, "the subject of the information [must be] afforded the opportunity to appear and contest the [Government's] claim." 47 U.S.C. § 551(h)(2). Any failure by the cable operator to comply with these restrictions can result in liability to the affected customer for actual damages, punitive damages, and attorney's fees. See 47 U.S.C. § 551(f).

*432 B. Electronic Communications Privacy Act of 1986
The Electronic Communications Privacy Act of 1986 (the "Electronic Communications Act") provides a system of privacy protections for electronic communications (i.e., email messages), as well as procedures for government access to the communications and related records. See 18 U.S.C. § 2701 et seq. In general, when the Government seeks to obtain information from a provider of electronic communication or remote computing services, the Government must demonstrate specific and articulable facts showing that there are reasonable grounds to believe that the requested information is relevant and material to an ongoing criminal investigation. See 18 U.S.C. § 2703(d). The procedures required differ depending on whether the Government seeks to discover the contents of electronic communications or merely records related to them (i.e., personal information of subscribers, user activity logs, billing records and so on). Compare 18 U.S.C. § 2703(a), (b) with 18 U.S.C. § 2703(c). Most notably, when the Government seeks only the related information, notice is not required to be given to the affected customer or subscriber. See 18 U.S.C. § 2703(c)(2). Any provider of electronic communication or remote computing services that discloses information in accordance with section 2703 is shielded from liability for any cause of action relating to the disclosure. See 18 U.S.C. § 2703(e).

II. The Statutory Conflict
Anyone familiar with the dynamic nature of the media and telecommunications industry in the late 1990's has probably by now gleaned the conflict. Cable operators, who are presumptively subject to the Cable Act, have begun providing Internet services to their customers over their existing fiber-optic and coaxial cable networks. See Thomas E. Weber, "Inside the Race to Grab High-Speed Connections: America Online Braces for Rivals In Cable Industry," Wall St. Journal B1 (Thursday, October 22, 1998) (noting entrance of cable companies into Internet services market). Providers of Internet services, however, have traditionally been viewed as subject to the Electronic Communications Act. See, e.g., McVeigh v. Cohen, 983 F.Supp. 215, 219 (D.D.C.1998) (noting that "[t]he [Electronic Communications Act], enacted by Congress to address privacy concerns on the Internet, allows the government to obtain information from an online service provider") (emphasis added). Thus, when a cable company provides Internet services to its customers, as the Company does in this case, it may appear to be subject to both Acts. And where those Acts conflict, the company may find itself stuck between the proverbial rock and a hard place.
With respect to this Application, for instance, the Company is in an awkward position. It has indicated a willingness to comply with the Government's request that the Application be sealed, yet it faces the possibility of punitive damages and attorneys' fees awards if it discloses customer information without providing notice to its affected customers. The Government, of course, is reluctant to allow such notice, given that one sure way to foul up an investigation is to provide premature disclosure of the investigation to its targets. Thus the disclosure provisions of the Cable Act, which require notice to the affected customer, and the Electronic Communications Act, which do not, threaten to whipsaw the Company in its good faith attempt to cooperate with the Government.
This is by no means the only statutory riddle raised by the entrance of cable operators into the Internet services market. The Federal Communications Commission (the "Commission"), for instance, has already addressed the question of whether providing Internet access is a "cable service" at least once, in the context of setting utility pole attachment rates for cable companies that provide such mixed services. See Implementation of Section 703(e) of the Telecommunications Act of 1996, Amendment of the Commission's Rules and Policies Governing Pole Attachments, CS Docket No. 97-151, Report and Order and Further Notice of Proposed Rulemaking, FCC 98-20, at ¶¶ 30-34 (February 6, 1998). Other issues that hinge on the crucial definitional question include whether cable companies must pay franchise fees on revenues derived from providing Internet *433 services, see 47 U.S.C. § 542(b); whether cable companies may lawfully restrict the resale or redistribution of Internet access, see Public Notice, DA 97-2002, Petition for Rulemaking, File No. CCB/CPD 97-51, "Pleading Cycle Established" (September 18, 1997); and, perhaps most significantly, whether cable companies must unbundle their various services and allow equal access to cable's high speed data capabilities by competing Internet access and on-line service providers, see Kathy Chen, "FCC Backs Away from Regulating Internet Gateway," Wall St. Journal (January 29, 1999) (describing intense lobbying by interested parties over question of whether cable's broadband capabilities must be opened up to cable competitors). These interpretive questions, though troublesome, should not be surprising. After all, as Justice Souter has noted, "as broadcast, cable, and the cyber-technology of the Internet and the World Wide Web approach the day of using a common receiver, we can hardly assume that standards for judging the regulation of one of them will not have immense, but now unknown and unknowable, effects on the others." Denver Area Educational Telecommunications Consortium, Inc. v. Federal Communications Commission, 518 U.S. 727, 776, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (Souter, J., concurring).

III. Conclusion
For a variety of reasons, today is not the day to resolve such ephemeral puzzles. Because customer information has not yet been disclosed and no claims have been made against the Company pursuant to section 551(f), the issue of the statutory conflict is not presented in a ripe, sharpened manner. See Lea Brilmayer, The Jurisprudence of Article III: Perspectives on the "Case or Controversy" Requirement, 93 HARV. L.REV. 297 (1979) (discussing reasons for following traditional doctrines of standing, ripeness and mootness). As noted above, the Company is not contesting the Application, and thus the Court lacks the benefit of vigorous adversary debate. Moreover, given that the Application and its related proceedings are under seal, the Court has not had the opportunity to receive or solicit amicus curiae briefs from interested third parties. Finally, special note must be made of the Commission and its ongoing efforts to grapple with the many issues arising out of the development of multi-faceted media and communications providers such as the Company. See, e.g., Barbara Espin, "Internet Over Cable: Defining the Future in Terms of the Past," Federal Communications Commission, Office of Plans and Policy Working Paper Series 30 (August 1998). It would be untoward of this Court to launch out in front of those efforts by issuing a formal opinion in the present circumstances. Accordingly, although by separate order, the Court allows the Government's Application. At this time it does not issue an opinion on the ultimate reconciliation of the statutory conflict highlighted by that Application.