Adamantia POLLIS, Plaintiff,

v.

The NEW SCHOOL FOR SOCIAL
RESEARCH, Defendant.

No. 93 Civ. 3328.

United States District Court,
S.D. New York.

July 21, 1993.

Janice Goodman, New York City, for plaintiff.

Putney, Twombly, Hall & Hirson, New York City, for defendant (Michael T. McGrath, James E. McGrath, III, and Craig N. Bonnist, of counsel).

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Adamantia Pollis is a tenured professor of political science on the graduate faculty of defendant The New School for Social Research (the "New School"). She was born on June 22, 1923 and so became 70 years of age on June 22 of this year.

In mid-December 1992, the Provost of the New School, Judith B. Walzer, advised Pollis that Pollis would be retired from her tenured appointment when she reached the age of 70. Walzer advised Pollis, and the New School maintains in this litigation, that for the past decade, the New School has implemented a policy of mandatory retirement at age 70. She invited Pollis to consider part-time employment as an adjunct professor.

In a subsequent exchange of correspondence, Pollis maintained that she could not legally be forced to retire at age 70. Walzer insisted that Pollis would be formally retired from the New School as of June 30, 1993. While this exchange was going on, Pollis wrote on March 2, 1993, to the Chair of the Political Science Department, to state that if the New School forced her to retire, she was applying by that letter "for a full-time teaching position at the rank of full professor in the area of comparative politics, beginning the academic year 1993–1994."

The New School has rejected that application on the ground that she could not, consistent with the institution's policies and practices, be eligible for a full-time teaching position, even if non-tenured, following her retirement from the faculty. The New School continues to hold out to Pollis part-time employment as an adjunct professor. As stated in greater detail *infra*, Pollis has accepted that appointment for the fall term.

Pollis contends that the New School's actions violate the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d) *et seq.;* and § 296 of the New York State Human Rights Law. On March 15, 1993 Pollis filed charges of age and sex discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Sixty day later she commenced this action. The EEOC complaint is still pending.

Pollis' complaint in this Court contains five causes of action. She alleges that she is entitled to equitable relief under the ADEA, Title VII, and the All Writs Statute, 28 U.S.C. § 1651 (first claim); that the New School violated the ADEA by compelling Pollis to retire and failing to consider her for hiring on an annual contract basis as a non-tenured faculty member (second claim); that the New School violated the EPA by denying Pollis the same salary as men who perform essentially the same duties (third claim); that the New School violated the New York State Human Rights Law (fourth claim); and that the New School breached Pollis' contract of employment (fifth claim).

By Order to Show Cause returnable on June 4, 1993, Pollis moved for a preliminary injunction restraining the New School from involuntarily retiring her at age 70. She bases her motion for preliminary equitable relief upon her ADEA and Title VII claims. The Equal Pay Act, New York State Human Rights Law, and breach of contract claims

**586**

are not implicated by plaintiff's preliminary injunction motion. *See* plaintiff's brief on preliminary injunction motion at 5 n. 1.

Given the exigencies of time, the New School agreed to defer Pollis' forced retirement until July 21, 1993. This hiatus allowed less frenetic briefing on a motion interposed by the New School for partial summary judgment under Rule 56 F.R.Civ.P., dismissing counts one, two, four and five of the complaint.

The New School's motion focuses primarily upon the ADEA and Title VII claims Pollis asserts in those causes of action, since as noted those claims alone underlie Pollis' motion for a preliminary injunction. It is important for both parties to know as soon as possible whether a preliminary injunction will issue.

In a Memorandum dated July 8, 1993, the Court advised the parties that plaintiff's ADEA claims would be dismissed; that the Court rejected defendant's claims that it lacked subject matter jurisdiction over the Title VII claims; and that the Court would hear evidence on the issues of irreparable harm and balance of hardships. That evidentiary hearing has been concluded. This Opinion resolves all outstanding issues.

*Discussion*

*The ADEA Claims*

Pollis asserts two ADEA claims: (1) that the New School violated the statute by compelling Pollis's retirement from the tenured faculty when she reached the age of 70; and (2) that the New School committed a separate violation when it refused Pollis's application for full-time, non-tenured contract employment. The New School asserts that it is entitled to summary judgment dismissing both claims.

■ Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferenc-

es against the moving party." *Coach Leatherware Co., Inc. v. Ann Taylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991) (citing *Knight v. U.S. Fire Insurance,* 804 F.2d 9 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)) (citation omitted). The responding party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' ... or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citations omitted). While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

On this aspect of the case, the ADEA furnishes the governing law.

Section 12(d) of the ADEA, 29 U.S.C. § 631(d) (West.Supp.1993), provides:

Nothing in this chapter shall be construed to prohibit compulsory retirement of any employee who has attained 70 years of age, and who is serving under a contract of unlimited tenure (or similar arrangement providing for unlimited tenure) at an institution of higher education (as defined by section 1141(a) of Title 20).

■ It is common ground that the New School is "an institution of higher education" as that phrase is used in § 12(d) of the ADEA; and that Pollis has attained 70 years of age. Accordingly, the plain wording of the statute entitles the New School to retire Pollis against her will if she "is serving under a contract of unlimited tenure (or similar arrangement providing for unlimited tenure) ..." This is so, notwithstanding the fact that under the statutory scheme, the special mandatory retirement provision for tenured employees found in § 12(d) will be automatically repealed on December 31, 1993. *See*

Pub.L. 99–592, 6(b), Oct. 31, 1986, 100 Stat. 3342, 3344.

■ While Pollis' status as a New School employee "serving under a contract of unlimited tenure" constitutes a "material fact" under the governing law, there is no genuine issue with respect to it.

The phrase "unlimited tenure" as used in § 12(d) of the ADEA has no statutory definition. However, the EEOC regulations, promulgated under statutory authority, deal with the concept at 29 C.F.R. § 1625.11(e)(1):

> The phrase "unlimited tenure" is not defined in the Act. However, the almost universally accepted definition of academic "tenure" is an arrangement under which certain appointments in an institution of higher education are continued until retirement for age of [sic; presumably should be "or"] physical disability, subject to dismissal for adequate cause or under extraordinary circumstances on account of financial exigency or change of institutional program. Adopting that definition, it is evident that the word "unlimited" refers to the duration of tenure. Therefore, a contract (or other similar arrangement) which is limited to a specific term (for example, one year or 10 years) will not meet the requirements of the exemption.

29 C.F.R. § 1625.11(e)(2) goes on to recite the intention of Congress that the exemption "apply only where the minimum rights and privileges traditionally associated with tenure are guaranteed to an employee by contract or similar arrangement." Acknowledging that "tenure policies and practices vary greatly from one institution to another," the regulation observes that

> the minimum standards set forth in the 1940 Statement of Principles on Academic Freedom and Tenure, jointly developed by the Association of American Colleges and the American Association of University Professors, have enjoyed widespread adoption or endorsement.

The 1940 Statement of Principles is then set forth in the regulation. It begins with this general statement:

> (a) After the expiration of a probationary period, teachers or investigators should have permanent or continuous tenure, and their service should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies.

The Statement goes on to list specific examples of "acceptable academic practice": (1) a writing containing the "precise terms and conditions of every appointment;" (2) a probationary period not exceeding seven years; (3) granting to a teacher during the probationary period "the academic freedom that all other members of the faculty have"; (4) certain due process provisions in cases of termination for cause of a continuous appointment; and (5) the requirement that termination of a continuous appointment "because of financial exigency should be demonstrably bona fide."

Having quoted the 1940 Statement of Principles on academic freedom and tenure, the EEOC regulations go on to observe at § 1625.11(3):

> A contract or similar arrangement which meets the standards in the 1940 Statement of Principles will satisfy the tenure requirements of the exemption. However, a tenure arrangement will not be deemed inadequate solely because it fails to meet these standards in every respect. For example, a tenure plan will not be deemed inadequate solely because it includes a probationary period somewhat longer than seven years. Of course, the greater the deviation from the standards in the 1940 Statement of Principles, the less likely it is that the employee in question will be deemed subject to "unlimited tenure" within the meaning of the exemption. Whether or not a tenure arrangement is adequate to satisfy the requirements of the exemption must be determined on the basis of the facts of each case.

Turning to the facts of this case, the affidavits and exhibits demonstrate that Pollis was granted tenure by a vote taken at the Executive Faculty Meeting of the Graduate Faculty of Political and Social Science on December 22, 1965. Thereafter Pollis was eligible to vote on other tenure candidates. In 1988 Pollis chaired a faculty grievance committee hearing arising out of a denial of tenure.

She twice served as chair of the political science department.

The New School set forth guidelines and regulations concerning tenure in a form adopted by the Board of Trustees on February 5, 1947. *See* Ex. F to the Walzer affidavit sworn to on May 28, 1993. The business records of the New School show that this document repeatedly came to Pollis's attention. *See* affidavit of Vice Provost Robert Gates, verified June 23, 1993. The Board of Trustees promulgated a further statement on retirement in January 1988, which stated in part that until the ADEA changes in 1994 "we will continue to require that tenured faculty retire at age 70." *See* Ex. O to Walzer affidavit. Pollis denies every seeing this document. I do not think the point is material.

Pollis contends that the New School tenure system does not meet the guidelines set forth in the EEOC regulations, and therefore does not qualify under the ADEA § 12(d) exemption. Pollis says that she never received a written agreement of the terms and conditions of her tenured appointment, as recommended by the 1940 Statement of Principles. She also denies the existence of "any standard rules and regulations embodying faculty rights and responsibilities," adding in support of that assertion that: "certainly there were no voted upon or circulated policies on retirement." Opposition brief at 32.

These protestations do not rise to the level of establishing a triable issue of material fact. Accepting *arguendo* that the New School did not deliver to each tenured faculty member the sort of document contemplated by subparagraph (1) of the 1940 Statement of Principles, the EEOC regulations provide that "a tenure arrangement will not be deemed inadequate solely because it fails to meet these standards in every respect." Sensibly enough, the regulation focuses upon the substance of the arrangement between the institution and the faculty member, and not upon a particular form. There is no substance to Pollis's conclusory assertion that policies concerning mandatory retirement were "to be submitted to the faculties for consideration." Pollis Affidavit sworn to May 10, 1993 at ¶ 3. Under familiar principles, the responsibility for such policy decisions is vested in the Board of Trustees.

In short, the affidavits and exhibits submitted by the New School demonstrate the existence of tenure policies and practices which conform sufficiently closely to the 1940 Statement of Principles to qualify under the EEOC regulations and consequently to fall within the ADEA § 12(d) exemption.

The parties debate at length in their affidavits and exhibits whether, as the New School contends, it promulgated and published a policy of requiring retirement of tenured faculty at age 70; or whether, as Pollis maintains, such policy was never promulgated or at least never made known to the faculty. There may be a dispute on the point, but under the governing law it is not material, and accordingly forms no impediment to summary judgment. Nothing in the ADEA limits the availability of the § 12(d) exception to institutions which maintain uniform policies of retirement. I agree with the district court in *Koprowski v. The Wistar Institute of Anatomy and Biology*, 16 EBC 1477, 1479, 1993 WL 106466 (E.D.Pa.1993), that "[w]ithout further indication that Congress intended that such mandatory plans be in place, a Court should not read such a requirement into the statute." The exception involved in *Koprowski* is that contained in § 12(c)(1), 29 U.S.C. § 631(c)(1), but the analysis is the same. Under the plain wording of § 12(d) the New School is entitled to force the retirement "of *any* employee who has attained 70 years of age" and is tenured (emphasis added); the use of the adjective "any" militates against a construction that the exception is available only to institutions who apply such a policy to *all* similarly situated employees.

Pollis is required by tactical litigation necessity to challenge the validity of the New School's tenure policies and practices. Her argument, if carried to its logical conclusion, would destroy the tenured status which she was granted in 1965, and that of all her colleagues. In point of fact, however, the New School's tenure policies and practices meet applicable academic standards, and Pollis herself has been a validly tenured member of the faculty since 1965. Had, at any time prior to the exigencies of this lawsuit, it had

been suggested to Pollis that she was not a properly tenured member of the New School faculty, I think her reaction would have been forceful.

It follows that the New School is entitled to summary judgment dismissing plaintiff's ADEA claim relating to her forced retirement.

■ Pollis' alternative ADEA claim is that the New School violated the statute when it refused to grant her application for full-time, non-tenured employment. This claim assumes the validity of the § 12(d) compulsory retirement. Plaintiff's theory is that once she is involuntarily retired under the § 12(d) exception, her "application for a non-tenured position becomes a simple hiring case," Brief in Opposition at 23, and the New School cannot reject her on the basis of age in the absence of a showing that "age is a bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation" of the School's business. *See* § 4(f)(1) of the ADEA, 29 U.S.C. § 623(f)(1); *Western Air Lines v. Criswell*, 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985).

In aid of that argument, Pollis hypothesizes three individuals: a 71–year old professor laid off by another institution because of budgetary cutbacks; a 70–year old professor mandatorily retired by another institution; and Pollis herself, voluntarily relinquishing her tenured position at the New School at age 69 and then applying at age 70 for a non-tenured position. Each of those hypothetical professors, the argument runs, is immune under the ADEA from rejection on the ground of age, at least in the absence of a BFOQ.

Assuming *arguendo* the correctness of the argument with respect to the three hypothetical individuals, it avails Pollis nothing because there is a material difference between each hypothetical and her own actual situation. Pollis was mandatorily retired by the New School in a valid exercise of the option conferred upon the institution by § 12(d) of the ADEA.

Under Pollis's statutory construction, the New School is required to hire her back on a full time (albeit non-tenured) basis, without regard to her age, so long as a vacancy exists. The parties do not cite, and I have not found, a case accepting or rejecting that construction. But I do not think it is sound. In § 12(d) Congress explicitly extended to institutions of higher education the option of "compulsory retirement" of tenured faculty members reaching the age of 70. In common usage "retirement" means that the employer is quit of the employee and the employee is quit of the employer; their prior relationship is severed. "Retirement" is defined as "the condition of being retired, as from one's former occupation or office." The American Heritage Dictionary of the English Language (1976) at 1110. "Generally, an individual's employment status terminates upon retirement." *Cohen v. Martin's*, 537 F.Supp. 766, 771 n. 11 (S.D.N.Y.), *aff'd*, 694 F.2d 296 (2d Cir.1982) (construing the ERISA statute). *Cf. Rowe v. Allied Chemical Hourly Employees' Pension Plan*, 915 F.2d 266, 269 (6th Cir.1990) ("The Group 2 plaintiffs have not retired from their employment at the Ashland plant, but are merely continuing it with a different employer.").

Pollis's construction of the statutory scheme would dilute § 12(d)'s compulsory retirement option to the more limited one of compulsory revocation of tenure, a reading which the plain wording of the statute does not allow. It also runs counter to the applicable EEOC regulation, which contemplates the continuing effect of the ADEA upon the relationship between an institution and a compulsorily retired tenured faculty member, but in a quite different context. 29 C.F.R. § 1625.11(g) provides:

> An employee within the exemption can lawfully be forced to retire on account of age at age 70 (see paragraph (a)(1) of this section). In addition, the employer is free to retain such employees, either in the same position or status or in a different position or status: *Provided*, that the employee voluntarily accepts this new position or status. For example, an employee who falls within the exception may be offered a nontenured position or part-time employment. An employee who accepts a nontenured position or part-time employment, however, may not be treated any less fa-

vorably, on account of age, than any similarly situated younger employee (unless such less favorable treatment is excused by an exception to the Act).

This regulation makes it clear that Pollis would come again within the ADEA's protection only if the New School offered her a new position and Pollis accepted it. The New School has offered Pollis an adjunct professorship, and Pollis has accepted it for the fall term; but those circumstances do not support an ADEA claim for full time employment.

Summary judgment will be entered in the New School's favor dismissing Pollis's claims under the ADEA.

*The Title VII Claims*

Dismissal of plaintiff's ADEA claims does not require dismissal of her Title VII claims, which allege discrimination based on sex, not age. Again, there are two claims. Pollis charges that male professors were preferred over female in respect of imposing compulsory retirement from tenured positions; and were also preferred in respect of offers of full time, non-tenured positions after reaching age 70. These claims, together with her ADEA claims, underlie Pollis' motion for a preliminary injunction.

▇▇▇ The New School challenges the Court's subject matter jurisdiction to enter a preliminary injunction based on Pollis' Title VII claims. It does so because Pollis has not yet received a right to sue letter from the EEOC in response to the Title VII claims she has asserted against the New School. The general rule is that a right to sue letter is a jurisdictional prerequisite to a suit seeking adjudication of the merits of a complainant's Title VII claim. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974).

But Pollis contends that where a person has filed a charge with the EEOC, the federal courts have jurisdiction rooted in their traditional equity power to entertain a properly supported motion for a preliminary injunction, intended to preserve the status quo while the charge is pending before the EEOC and before that agency has issued a right to sue letter.

The Second Circuit reached that conclusion in a case where the employee's Title VII claims included one of employer retaliation, *Sheehan v. Purolator Courier Corp.*, 676 F.2d 877 (2d Cir.1981), and reiterated it in *Holt v. Continental Group, Inc.*, 708 F.2d 87 (2d Cir.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1294, 79 L.Ed.2d 695 (1984), another retaliation case. Neither opinion affirmed the granting of a preliminary injunction; each case was remanded to the district court with instructions to exercise a jurisdiction that the district court had concluded it did not have. The Second Circuit reaffirmed the holdings of *Sheehan* and *Holt* in *Stewart v. United States Immigration and Naturalization Service*, 762 F.2d 193, 198 (2d Cir.1985), although in that Title VII retaliation case the district court lacked jurisdiction to issue a preliminary injunction because the plaintiff (unlike that at bar or in *Sheehan* and *Holt*) had not filed a complaint in the district court asserting the underlying claim before seeking an injunction with respect to it.

The New School argues that because these Second Circuit decisions all involved retaliation claims, the limited jurisdiction they declare is available only in such cases. I do not agree. In *Sheehan* Judge Kearse, drawing support from Supreme Court and appellate cases in other contexts and having nothing to do with retaliation, said that "within the framework of Title VII, we are persuaded that Congress intended the federal courts to have resort to all their traditional equity powers, direct and incidental, in aid of the enforcement of the Title." 676 F.2d at 885. This is a broadly stated rationale, although the ultimate holding was narrow. "Traditional equity powers" depend upon broad considerations of fairness, and not upon the narrow confines of the particular claim presented.

Two judges of this Court have exercised *Sheehan's* form of limited jurisdiction over discrimination claims which did not involve retaliation. Judge Carter did so in *Irizarry v. New York City Housing Authority*, 575 F.Supp. 571, 573 (S.D.N.Y.1983), citing and quoting "the more general principle" articulated by *Sheehan* which I quoted *supra*. The New School says Judge Carter's language is

dicta because *Irizarry* involved a retaliation claim. So it did; but Judge Carter needed to expand the *Sheehan* rationale to non-retaliation cases in order to assume jurisdiction over plaintiff's first claim for ethnic discrimination, which he did. *See id.* at 571–72. In *Altman v. New York City Health and Hospitals Corp.*, 1993 WL 106166 (S.D.N.Y.1993), a case arising under the Americans with Disabilities Act which contained no retaliation claim, Chief Judge Griesa cited and quoted *Sheehan* in taking jurisdiction of plaintiff's claim for a preliminary injunction "during the waiting period prior to the issuance of a right to sue letter." *Id.* at *3.

I conclude that, during the pendency of Pollis' Title VII claim before the EEOC, this Court has jurisdiction to consider her motion for a preliminary injunction, even though a right to sue letter has not yet issued.

But the *Sheehan* jurisdictional rationale, which I apply here, does not "alter the traditional showing that a party must make in order to persuade the court that injunctive relief is appropriate." *Sheehan* at 887. The traditional criteria require plaintiff to demonstrate that (1) she is likely to suffer irreparable harm and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping in favor of the party seeking relief. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985) (citing cases).

■ In the case at bar, plaintiff's motion for a preliminary injunction fails because she has not demonstrated irreparable harm.

■ While the salary paid a part-time adjunct professor (the position the New School has offered to Pollis and Pollis has spurned) is significantly less than her salary as a tenured, full-time faculty member, it is well settled that "the requisite irreparable harm is not established in employee discharge cases by financial distress or inability to find other employment, unless truly extraordinary circumstances are shown." *Holt, supra,* at 90–91 (citing *Sampson v. Murray,* 415 U.S. 61, 91–92 & n. 68, 94 S.Ct. 937, 953–54 & n. 68, 39 L.Ed.2d 166 (1974)). In a careful opinion, Judge Platt held in *Williams v. State University of New York,* 635 F.Supp. 1243, 1249 (E.D.N.Y.1986), that "[i]n essence the plaintiff must quite literally find herself being forced into the streets or facing the specter of bankruptcy before a court can enter a finding of irreparable harm."

In the case at bar, Pollis does not claim irreparable harm resulting from financial distress. She expressly renounced that theory at the evidentiary hearing. Tr. 34. Rather, Pollis claims irreparable harm as the result of emotional and psychological distress attendant upon her loss of full-time tenured faculty status.

To evaluate that claim, it is necessary to consider the circumstances in greater detail.

Pollis obtained her bachelor's degree at Hunter College and a Masters' Degree in Economics from Johns Hopkins University. In 1958 she earned a Ph.D. in Political Science from Johns Hopkins University. The New School hired her in 1964 as an untenured associate professor in the political science department. The New School granted tenure to Pollis in 1966 and promoted her to full professor in 1977. The political science department elected Pollis its chair twice from 1969 to 1970, and from 1981 to 1984. Tr. 25–28.

Within the field of political science, Pollis specializes in comparative politics, focusing upon state, society and global perspectives. Within those broader boundaries, Pollis has developed several areas of expertise. She has developed a subprogram on human rights, offering several courses in that area in the most recent New School curriculum. Pollis also teaches nationalism and ethnicity, and the politics of development. Occasionally she gives a course in the European community. Pollis regards her area of specialization as of particular relevance today given events in such troubled parts of the world as the former Yugoslavia and Somalia. Pollis

testified that this current state of affairs "brings together, actually, something that I am trying to work on now, which is both the issue of human rights, the issue of ethnic rights, their connection or the conflict between them—it is of enormous importance." Tr. 29.

Pollis has published extensively in her field. At present she has a contract to publish a book on the human rights movement subsequent to World War II. Pollis entered into that contract with a publisher some two years ago. Tr. 29, 96. At the beginning of her testimony Pollis said that she was also "finishing a book on the Greek judiciary and human rights," Tr. 29; later, she said that she did not have "another book contract," but was involved with "some other articles that I am supposed to revise," Tr. 97–98.

Pollis is currently president of the Modern Greek Studies Association, an "interdisciplinary, international organization of scholars that do research and writing on Greece." Tr. 29. She has been an officer of the Comparative Interdisciplinary Studies Section of the International Studies Association. Tr. 30. Pollis says that there has been no diminution in her work production over the last five years. On the contrary, she considers that since her earlier academic years involved contending with gender-based barriers, "my productivity came later rather than earlier." Tr. 30. Pollis claims to be free of any health problems limiting her ability to teach. Tr. 30. She appears to come from a hardy family. Her brother Nicholas Pollis, also a professor, testified that their mother, who will be 94 this August, is still sufficiently spry to spend six months in Athens and six months in New York each year.

Colleagues called by Pollis as witnesses gave convincing confirmation of her academic stature and world-wide reputation. Dr. George Frangos, who has taught history at a number of colleges and universities, is presently Associate Provost for Academic Program at the State University of New York Health Science Center at Brooklyn (previously known as the Downstate Medical Center). Frangos has held that position for five years. Previously he was Associate Vice-Chancellor for Graduate Studies at the State University in Albany. Frangos's particular scholarly interest is Modern Greek and Balkan history. Frangos has worked with Pollis, who shares that interest, since 1968. Frangos described his association with Pollis, and Pollis's present reputation and stature, in these words:

She and I began a very long collaboration, down to this day. We started doing this political work in the sense of trying to inform the American public. But we began to collaborate in terms of scholarship. We did scholarly projects. We continued—that is, Dr. Pollis is presently president of the Modern Greek Studies Association, MGSA. I used to be on the executive committee of it. We have done quite a bit of work together in terms of planning for conferences, chairing scholarly panels and that sort of thing.

Q. Do you work in the same or do you share an academic area specialty with Dr. Pollis?

A. Yes, we do share. My own specialty—in fact my main interest continues to be scholarship but I can't do it as often as I like—is in modern Greek and Balkan history. Dr. Pollis did her dissertation on modern Greek history but since has spread out. She is a political scientist and most of her work recently, certainly in terms of her reputation has been in the field of human rights.

Q. As a historian in the same field or sharing a field of interest with Dr. Pollis, can you tell us what her reputation is in that scholastic field?

A. Yes. I would say that internationally she is probably the senior, sort of female— to mention it that way I think it important. She certainly is very, very well known both in the Balkans and the European community for the work she has done on human rights. She came to, I guess, international attention with an article that was published just about the time that I met her, 1968—I am not sure she remembers this. It is really a path-breaking article on the notions of—or the definition of identity, national identity and its psychological basis. That article has been cited many, many, many times.

In any case, she is invited to conferences all over the world. She most recently was in Spain, I think. She has been in the University of Bologna in Italy. She has been to Switzerland. I can't remember all the places she has been to. These are all invited to speak.

Q. Has she ever been invited by governments or agencies to address those agencies?

A. Yes. She has been on several occasions kind of an adviser to the Greek government. She was an adviser to George Mavros, who was Greek minister immediately after 1968. She became adviser to the Papandreou government throughout its duration. That included an invitation for her to be a resident scholar at the Institute for Mediterranean Studies in Greece, and that was in Athens, that, I think, in 1985—I forget what year it was. Whatever, it was recently.

She has very often been invited to speak before the United Nations on issues of human rights, she has, early on with the Greek affairs especially—and Cyprus. She is also considered the expert on Cyprus in the United States in terms of political science. She has been asked to testify before congressional committees.

That kind of thing.

Tr. 5–7.

Comparable testimony was given by Peter Juviler, a professor of political science at Barnard College and the co-director of the Columbia University Center for the Study of Human Rights. Juviler teaches the basic course at Columbia in comparative politics. He regards Pollis as a colleague rather than a friend. He has encountered her contributions in the field on several occasions.

In that regard, Juviler testified succinctly: "It seem she is everywhere." By way of illustration Juviler testified:

I was in Prague at an international meeting of human rights in a new world order and she gave an important paper there. That was in June of last year. The meeting was from June 8 to 12 of 1993. [sic] And then I happened to be at a university seminar which is reserved for human rights specialists at Columbia in I think March 29 which Professor Pollis presented a paper. We argued extensively, I remember, after her presentation because we come from different directions, somewhat different emphases, although we are coming closer together now in the field of human rights. I was very interested in the discussion. It was a lively and quite controversial one.

Tr. 15.

Juviler testified that for Pollis "to be invited to that Prague meeting was an honor, I think, in a sense or a recognition of her professional competence"; Juviler assigns Pollis' writings to his own students. Tr. 16.

While the New School had decided to retire Pollis as of June 30, 1993 when Pollis reached the age of 70, the administration had not communicated that intention to Pollis as of mid-December 1992. Provost Walzer testified that she had made several unsuccessful attempts to reach Pollis by telephone in order to discuss the retirement with her, and that Pollis took the initiative and telephoned Walzer to ask for a meeting. Pollis is skeptical that Walzer tried to reach her. The issue is not material. It is common ground that, at the suggestion of a faculty colleague, Pollis telephoned Walzer and arranged to meet with her in December 1992. The conversation, which took place in Walzer's office, was unsatisfactory from every point of view. Walzer intended to advise Pollis that she would be retired in June, and then proceed directly a discussion of post-retirement arrangements that could be made between the New School and Pollis. That agenda came to nothing because Pollis, expressing surprise and outrage, stated flatly that she had no intention of retiring. Walzer and Pollis memorialized their opposing points of view in an exchange of letters dated December 14 (Walzer to Pollis), December 28 (Pollis to Walzer), and January 14, 1993 (Walzer to Pollis). DX. A, B; PX 3.

As noted during the ADEA discussion *supra*, Pollis unsuccessfully applied for a full-time post-retirement faculty position. That application was rejected in a letter to Pollis dated March 9, 1993 from Aristide R. Zolberg, the chair of the Political Science De-

partment. Zolberg went on to say in that letter, PX 4:

> On the other hand, you are quite right to point out that we are going to have some shortages in the areas of your teaching expertise; and as I have told you several times, I would be happy to recommend that you be appointed as an adjunct to that effect.
>
> To avoid duplication with the areas covered by Tony and myself it would be particularly helpful if you taught a course in human rights, and possibly another on "State Terrorism."

Zolberg was attempting to secure Pollis's services as an adjunct professor for both the fall and spring terms in the 1993–1994 academic year. Pollis testified at the hearing: "Professor Zolberg kept coming back and saying, why don't you teach one course in the fall and one in the spring, because we need the human rights field, there is nobody else to teach that." Pollis has agreed to teach a graduate course in human rights as an adjunct professor during the fall term. She sent a memorandum dated April 5, 1993 to Zolberg, PX 5, which read as follows:

> I feel a strong sense of responsibility to all those students who planned to do graduate work in the area of human rights. Consequently I would be willing to teach a course in the fall, 1993 semester with the understanding that this does not imply that I accept the New School's termination of my full-time employment. Furthermore, the pay for this course is subject to negotiation.

Pollis has reserved decision on whether or not to teach a course during the spring 1994 semester.

It is in these circumstances that Pollis asserts a claim of irreparable harm based upon emotional and psychological suffering and deprivation.

That claim proceeds in part from the fact, not disputed by the New School, that the position of adjunct professor is far less prestigious a position than a full-time professorship on the faculty. An adjunct professor is not a fully participating member of the faculty. The adjunct professor has no voice in departmental matters, does not vote on tenure, and may or may not be welcome at departmental meetings. Adjunct professors are typically regarded as individuals who have made their primary reputations in other fields or in other places (for example, judges or lawyers teaching as adjunct professors at law schools).

Pollis describes the consequences of this change in her status in bleak terms. She testified that she will lose her research assistant who has been assisting her on the contracted for book. "I will lose the computer serves that I have been making use of. I will lose library privileges. I will lose funding from the New School to attend conferences." "I will not have, either in terms of teaching, mentoring students, colleagues—I will be sort of isolated, somewheres, nowheres." Pollis regards herself as irreparably harmed "because it is insulting and degrading to be listed as an adjunct." She continued:

> Secondly, as an adjunct I am marginal to the institution, to the academic world. I do not have access to any of the facilities or fringe benefits that regular faculty do, so I don't have library, computer center, research assistance. All that goes with being a faculty member and not an adjunct that walks in off the street, gives a lecture and then walks back home.

And she added that "[a]s an adjunct I would lose all my involvement with students." Tr. 35, 36, 43, 44. These several deprivations, Pollis testified, leave her depressed, unable to concentrate on other work at hand, with her sleeping and eating habits disturbed.

I fully accept that the threat of a forced retirement has caused Pollis significant emotional and psychological distress. It would be surprising if that were not so. Pollis is clearly an effective and dedicated teacher. I heard without any particular surprise the expert opinion testimony of Dr. Dorothea Braginsky, a social psychologist, who was called by Pollis to testify, that older people who lose their work may experience devastating effects.

It is also necessary to say, however, that in her testimony, Pollis overstated the practical consequences of her change in faculty status in material ways.

Professor Zolberg, the political science department chair, needs Pollis to teach a course in human rights to graduate students next year. Zolberg has obtained Pollis's commitment to teach during the fall semester. He hopes to persuade her to do so during the spring semester. While Pollis's title during the coming academic year will be the lesser one of adjunct professor, the evidence does not sustain the dismal picture Pollis paints of that existence: arriving from home, teaching the course, and then having to quit the institution's premises at once; being deprived of all library and computer facilities; being isolated from all the students, with no opportunity to advise or mentor them.

Provost Walzer testified, and I accept, that although space is chronically short at the New School, office space can be found for adjunct professors, although they may have to share that space; that there is no policy or practice at the New School which precludes adjunct professors from making full use of the library or the computer facilities, including word processors and printers; and that Pollis would be expected to continue advising and supervising graduate students who, under Pollis's tutelage, are well along in their master's and doctoral theses and dissertations. Tr. 126, 186–87. Pollis herself acknowledged that in the fall she would continue to mentor a doctoral candidate and "a couple at the master's level." Tr. 100.

The present record does not allow a precise description of the conditions of Pollis's employment in the fall as an adjunct professor. That is because the parties have had no discussions on the subject. There is not so much a failure of communication as its absence. Each party blames the other. Pollis says that the New School administration has entirely failed to take the initiative in negotiating a humane post-retirement package of the sort Walzer described in a policy statement she drafted and distributed to the deans and department heads in 1988. PX 13. Walzer says that she intended to introduce these subjects during her December conference with Pollis, but abandoned the thought when Pollis stated unequivocally that she would not retire and, figuratively at least, slammed the door to the Provost's office on her way out. There is some substance to both perceptions, although the issue is not one of central importance. Judging at least by Zolberg's conduct as described by Pollis (Zolberg did not testify), the chair of the political science department had either never heard of the 1988 retirement policy statement, or chose to disregard it. On the other hand, Walzer attempted to keep the door open. In her letter to Pollis dated January 14, 1993, PX 3, Walzer urged Pollis to consider "part-time teaching after you have retired," and concluded: "Please let me know if there is anything I can do to help." That offer fell on deaf ears. Pollis responded by filing a EEOC complaint and commencing this litigation. It is difficult to negotiate terms with one who makes it clear there will be no agreement.

Notwithstanding my inability on the present record to predict the precise terms and conditions of Pollis's employment as an adjunct professor, I find on the basis of the evidence and the reasonable inferences it supports that Pollis will not be entirely deprived of office space, barred from any use of the library and computer facilities of the New School, and isolated from all the graduate students under her direction. She may very well lose her present student research assistant, whose activities appear to focus on Pollis's contracted-for book. Her office space will be reduced; she will teach fewer courses, and directly advise, supervise or "mentor" fewer graduate students. Her title, as it appears in the New School catalogues, will be changed in a manner which Pollis regards as demeaning and which she strongly resents.

The evidence shows, in short, not that condition of near-total academic deprivation and isolation Pollis described in her affidavits and direct testimony, but reductions and limitations. The New School proposes to change, not terminate, Pollis's participation in its faculty.

It follows that, to a significant degree, Pollis has failed to prove her theory of irreparable harm. That is the context in which the proof must be viewed at this state of the litigation. In a post-hearing letter brief, counsel for Pollis views the controversy

about Pollis's post-retirement package (or lack of same) as implicating the doctrine of mitigation of damages, and argues that the New School has not satisfied *Ford Motor Co. v. EEOC,* 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), with its references to the seeking or offering of comparable or substantially equivalent employment. But mitigation of damages has nothing to do with the instant case in its present posture. Mitigation of damages arises in discrimination cases after the employee has established the employer's liability; the employer may then reduce the award by proving, if it can, that the employee failed to mitigate damages. One way that an employer can do that, *Ford Motor Co.* holds, is to show that during the pendency of the claim the employee was offered the same or comparable employment, albeit without retroactive seniority. But the case at bar is nowhere near that stage. The case has just begun; plaintiff seeks a preliminary injunction; and she bears the burden of proving that failure to issue the injunction will cause her irreparable harm before the disputes are resolved by trial. To the extent that the proof at the hearing fails to sustain plaintiff's claims of irreparable harm, it militates against a holding that she has sustained that burden.

It is useful to reiterate at this point the period of time with which I am concerned in deciding whether or not to issue a preliminary injunction. As the Second Circuit held in *Citytrust,* Pollis like any applicant for a preliminary injunction must demonstrate that she "is likely to suffer irreparable harm before a decision on the merits can be rendered." 756 F.2d at 275. In the case at bar, it is reasonable to assume that this Court will reach a decision on the merits of Pollis's Title VII claims by the end of the 1993–1994 academic year. If the EEOC rejects Pollis's administrative claim, this Court will become vested with full jurisdiction sometime in mid-fall. I will enter an order of expedited discovery if such order is applied for. Given the Court's presently limited jurisdiction, I cannot make such an order now; nor could I order the trial of the action on the merits to be advanced and consolidated with the recent hearing of the preliminary injunction application under Rule 65(a)(2). However, that rule provides that the evidence received on the application "becomes part of the record on the trial and need not be repeated upon the trial," and so a significant part of the trial record in this non-jury proceeding has been accomplished. Subject only to the exigencies of the criminal calendar and other emergency civil applications, I will give this case priority so that it should be ripe for decision during the spring of 1994.

Thus the question that is posed is whether Pollis will suffer irreparable harm during that period of time if she does not receive a preliminary injunction retaining her as a tenured full-time faculty member. It is to that position that she will be restored if she sustains her claims of discrimination at trial.

It is pertinent to note that an important aspect of Pollis's academic activities should not be adversely affected during this relatively brief period. As noted, Pollis has achieved world stature in her field; and it is illogical to assume that the New School's adverse action, unwelcome as it is to Pollis, will transform her overnight into a pariah or nonentity on that larger academic stage. By way of illustration, Frangos testified that Pollis is currently engaged in planning for a symposium to be held in San Francisco in the fall for the Modern Greek Studies Association. Tr. 9, 16. Thus it cannot be said that Pollis's removal from the full-time New School faculty for one academic year will exile her entirely from her profession.

I recognize that Pollis described herself as obsessed with this litigation, and unable to concentrate effectively on anything else. To the extent that this mind set supports a claim of irreparable injury, Pollis has an interest in exaggerating the condition. Some corroboration is found in the testimony of other witnesses. Frangos testified that "her work has been disrupted. I hesitate to say—she is here—but she has been really obsessed by it." Tr. 9. Dr. Jane Sweeney, another friend and colleague of Pollis's (Pollis was her dissertation mentor), testified that Pollis presently "is distracted, she is upset, she is depressed." Tr. 105.

Professor Nicholas Pollis, plaintiff's brother, gave somewhat more reassuring testimo-

ny with respect to the plaintiff's present condition. Nicholas Pollis teaches in Wisconsin. While he has not had "much time to see [his sister] physically functioning behaviorally, ... from what I have seen and from our discussions, aside from her obsession with the situation, she has been a little bit off center, not quite as focused as she normally is on other issues and other aspects." There was a recent family reunion in Greece; and Nicholas Pollis described his sister's behavior at that reunion, in comparison to how she usually acts with her family, as "[n]ot quite as effusive, not quite as capable of enjoying the superior food that is available." Tr. 66–67.[1]

While mental anguish is arguably a factor to be considered in the context of irreparable harm, *see* discussion *infra*, I discount it in the case at bar for two reasons. First, the claim is not supported by professional medical or psychological opinion. Second, assuming that Pollis is "obsessed" with this litigation (I used the word in its vernacular rather than clinical sense), it is illogical to assume that the obsession will dissipate entirely if a preliminary injunction issues. Pollis's concentration upon this lawsuit is entirely understandable. Its outcome will determine her future. There can be nothing else as important to her. As the case proceeds through discovery to trial, it will continue to hold that central place in Pollis's awareness, waking and perhaps sleeping; and that will be true, it seems fair to assume, whether or not a preliminary injunction issues. Therefore granting an injunction will not entirely alleviate the condition.

I think that if at the end of the 1993–1994 academic year Pollis prevails on the merits and is restored to her tenured full-time position on the New School faculty, the stress of the interim period will be largely repaid by a sense of triumph vindication. There is, I believe, a saying that revenge tastes best when eaten cold.

Having described the circumstances of the case as revealed by the present record, I turn to the pertinent case law.

The New School contends that the non-economic effects of which Pollis complains cannot as a matter of law, whether considered alone or in combination, constitute irreparable harm sufficient to justify injunctive relief. The New School relies upon a Supreme Court decision, *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), and two Second Circuit cases: *Stewart v. United States Immigration and Naturalization Service*, 762 F.2d 193 (2d Cir. 1985), and *Holt v. Continental Group, Inc.*, 708 F.2d 87 (2d Cir.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1294, 79 L.Ed.2d 695 (1984).

In *Sampson*, a probationary federal employee notified of her discharge complained that civil service regulations had not been followed and obtained a preliminary injunction from the district court pending an administrative appeal. In addition to deprivation of income, plaintiff alleged as a basis for relief "the humiliation and damage to her reputation which may ensue." *Id.* 415 U.S. at 91, 94 S.Ct. at 953. The Supreme Court, reversing the District of Columbia Circuit, observed that probationary federal employees were entitled to only limited substantive and procedural protection, 415 U.S. at 80–81, 94 S.Ct. at 948–49, and also held:

> Assuming for the purpose of discussion that [plaintiff] has made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case.

*Id.* at 91–92, 94 S.Ct. at 953–54.

The Court in text did not further define "this type of case"; but it dropped footnote 68 at that point in the opinion, which says:

> We recognize that cases may arise in which the circumstances surrounding and employee's discharge, together with the resultant effect on the employee, may so

---

1. Professor Nicholas Pollis explained that he regarded the food available in Greece as superior to that available in Wisconsin. *Id.*

far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence.... [W]e do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, when discharge of probationary employees is an issue, should be reserved for that situation rather than employed in the routine case.

The plaintiff in *Sampson* did not allege discrimination. The plaintiff in *Stewart*, an INS employee, alleged discrimination and retaliation under Title VII. The district court entered into a preliminary injunction. The Second Circuit held that the district court lacked jurisdiction over plaintiff's motion, a point of decision not relevant here. But the Court went on to hold that even if the district court had jurisdiction, it erred in finding that plaintiff had shown irreparable harm. Plaintiff alleged that by suspending him, the INS caused him irreparable harm

by, *inter alia*, degrading and humiliating him in the eyes of his peers, family, and community, thereby damaging his reputation and self-esteem, by causing his family to suffer undue hardship, and by preventing from adequately providing for his family.

762 F.2d at 199–200.

The Second Circuit cited *Sampson* as controlling authority requiring the rejection of Stewart's claimed injury to his reputation as a basis for preliminary injunctive relief. *Stewart* characterizes *Sampson* as articulating "a particularly stringent standard for irreparable injury in government personnel cases." *Id.* at 199, 200.

*Holt*, the third case relied upon by the New School, did not involve a federal employee. Nor did it involve claims of humiliation or other emotional distress. The plaintiff in *Holt* was a lawyer who filed a discriminatory treatment claim against her employer and then, after the employer discharged her, brought an action in the district court complaining of both discriminatory treatment and retaliatory conduct. The district court denied a preliminary injunction and plaintiff appealed. The Second Circuit held that plaintiff's allegations of economic damage did not demonstrate irreparable harm, citing *Sampson*. 708 F.2d at 90–91. Nonetheless, the court of appeals remanded the case to the district court to consider the claim that the allegedly retaliatory discharge might deter other employees from filing Title VII claims or supporting the plaintiff in her claim. "These risks may be found to constitute irreparable injury," the Second Circuit said, although it went on to reject the suggestion "that there is irreparable injury sufficient to warrant a preliminary injunction in every retaliation case." *Id.* at 91. In the case at bar, Pollis makes no retaliation claim; and *Holt* says nothing about the viability of claims of emotional or psychological damage in the context of irreparable harm.

I cannot accept the New School's contention that *Sampson* and its Second Circuit progeny establish a rule that non-economic claims such as emotional or psychological damage can never, as a matter of law, demonstrate irreparable harm sufficient to justify a preliminary injunction. When one reads *Sampson*'s footnote 68 and the accompanying text, it is not clear if the Supreme Court intended the "particularly stringent standard" it articulates to apply to plaintiffs other than probationary federal employees. In *Stewart*, the Second Circuit, rejecting on the authority of *Sampson* non-economic claims asserted by another federal employee, characterized the *Sampson* rule as applicable "in government personnel cases." However, *Holt* involved a private employee and the Second Circuit applied *Sampson*, at least with respect to the economic claims.

I think there is some doubt as to whether the Second Circuit would apply that particularly stringent standard required in government personnel cases to a private employee's claims of emotional or psychological harm. Assuming that it would, *Sampson* nonetheless appears to sanction a preliminary injunction where the circumstances surrounding an employee's discharge "together with the resultant effect on the employee" give rise to a "genuinely extraordinary situation." In short, these cases cannot be read as constituting an absolute bar to non-economic dam-

age as a basis for demonstrating irreparable harm.

Pollis relies upon a number of cases, for the most part from other circuits, in which emotional or psychological harm was regarded as a sufficient basis for preliminary injunctive relief. Pollis relies primarily upon four of those cases. Three involve teachers. *Chalk v. United States District Court*, 840 F.2d 701 (9th Cir.1988); *Saunders v. George Washington University*, 768 F.Supp. 843 (D.D.C.1991); *Assaf v. University of Texas System*, 399 F.Supp. 1245 (S.D.Tex.1975), *aff'd*, 557 F.2d 822 (5th Cir.1977), *judgment vacated as moot*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978). The fourth case involves a state court judge. *EEOC v. State of Hawaii*, 764 F.Supp. 158 (D. Hawaii 1991).

The plaintiff in *Chalk*, who had developed AIDS, was a teacher of hearing impaired children. Rejecting plaintiff's medical evidence that his presence in the classroom did not endanger his students, the school board removed plaintiff from the classroom and assigned him to preparing grant proposals. The Ninth Circuit noted: "This job is 'distasteful' to Chalk, involves no student contact, and does not utilize his skills, training or experience." In those circumstances Chalk suffered damage because "[h]is closeness to his students and his participation in their lives is a source of tremendous personal satisfaction and joy to him and of benefit to them." *Id.* The Ninth Circuit also said that "[a]n additional factor favoring a preliminary injunction here arises from the very nature of Chalk's affliction." Because AIDS is always fatal, "[a] delay, even if only a few months, pending trial represents precious, productive time irretrievably lost to him." *Id.* at 710.

The plaintiff in *Saunders* was a non-tenured black female college professor who claimed that the University's refusal to place her on a tenure track was discriminatory and retaliatory. The University stated clearly that it intended to discharge plaintiff. 768 F.Supp. at 848. The district court granted plaintiff a preliminary injunction keeping her on the faculty pending trial. The court's rationale appears at 845:

Saunders has also shown a threat of irreparable injury absent injunctive relief. She has provided unrebutted evidence that the harm to her career and professional reputation from an interruption in service would be irreparable. As Dr. Cunningham explains, "[u]niversity professors and administrators recruiting new faculty are busy people, and I think it unlikely that many would take the time necessary to become familiar with the facts surrounding any period of employment." Third Cunningham Affidavit ¶ 5. As a consequence, even if Saunders were to prevail on the merits, the fact that she had an interruption in her employment would "always cast a cloud, even if she [were] ultimately reinstated through judicial process." Thus, for example, "[i]n a search process where two or more candidates have credentials of similar strength otherwise, a candidate with an unexplained career interruption is likely to be dropped from further consideration."

*Id.*

In *Assaf*, the defendant University advised plaintiff, a non-tenured contract professor, that his contract would not be renewed and he would be discharged. Plaintiff alleged a denial of due process. The district court granted a preliminary injunction, stating at 399 F.Supp. at 1251:

Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician, especially one in the sciences. Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money. Also, here plaintiff faces termination less than a week from the date of this court's hearing. It is clear that this situation has come about purely from the inability of plaintiff to clearly ascertain his status until a short time ago. If any fault is to be found, it is in the bureaucratic monolith which operates in most state institutions. Under all the circumstances, in

this court's view the anticipated harm must be characterized as irreparable.

In *Hawaii*, the EEOC challenged on behalf of a state court judge the state-imposed requirement that he retire at the age of 70. At the time of decision, the Supreme Court had not yet decided whether such judicial officers fell within an exception to the ADEA.[2] The district court granted a preliminary injunction on the ground that the EEOC had demonstrated irreparable harm on the part of the judge. The district court said that:

> EEOC points out that once removed from his position, Judge Tanaka will be effectively committed to retirement. Because of his age, it is unlikely he will be able to find other employment of comparable status and responsibility. Declaration of Harry T. Tanaka at ¶ 17 and Declaration of James S. Burns at ¶¶ 6 & 7 (Judge Tanaka would not even be allowed to serve as a temporary judge). Financial hardship will also result to Judge Tanaka because his retirement benefits will be substantially less than his current salary. Tanaka Declaration at ¶ 6. No less importantly, Judge Tanaka's emotional and psychological health will suffer as a result of being forced to retire while he is still fully competent to perform his duties. *Id.* at ¶¶ 5 & 8.

There are other cases which hold that emotional or psychological harm may constitute irreparable damage. The Ninth Circuit cites several at 840 F.2d at 709. My research has revealed others.

Thus in *Callicotte v. Carlucci*, 698 F.Supp. 944 (D.D.C.1988), plaintiff, an alcoholic and emotionally troubled woman who challenged her discharge from a federal agency, was granted a preliminary injunction because the district court found that the harm caused by her removal "would extend far beyond financial boundaries." The court continued:

> First, reinstatement is unlikely. The DMA is likely to fill her position as a skilled personnel manager and there is no assurances that equivalent jobs will be vacant. Second, removal would impair plain-

tiff's ability to keep up with the changes in the agency. Indeed, Mr. Meoli stated that the agency is in the process of implementing a new computer system requiring significant changes and retraining. Thus removal at this time would place plaintiff at a significant disadvantage. Furthermore, she has no alternative source of income if removed. She has no immediate personal or family resources to draw upon; both her mother and brother are alcoholics and can offer neither financial nor emotional support. And as represented by her counsel, Ms. Callicotte has no private unemployment insurance and would likely face bankruptcy should she lose her employment and income. Most importantly, removal could cause plaintiff severe physical and emotional harm. And as Dr. Kline opined, "her resultant impoverishment will, in all probability, severely increase her depression and lead to her suicide.

*Id.* at 950–51.

In *May v. Gray*, 708 F.Supp. 716 (E.D.N.C.1988), plaintiff challenged his discharge from the military on drug charges. The district court, distinguishing *Sampson*, granted a preliminary injunction because there was evidence that "there will be a delay between plaintiff's separation and review, if any," by the administrative agency; indeed, there was "no guarantee that plaintiff will be afforded a full hearing." The court found irreparable harm in those circumstances, and also because "[d]uring the interim, plaintiff will be forced to seek employment with a military service record that adjudges him, in effect, 'guilty' of controlled substance abuse." 708 F.Supp. at 719.

In *Keyer v. Civil Service Commission of the City of New York*, 397 F.Supp. 1362 (S.D.N.Y.1975), the defendant City dismissed plaintiffs in a matter which stigmatized them, coupling that injury with a deprivation of due process remedies. Distinguishing *Sampson*, the district court granted plaintiffs a preliminary injunction because of "a total denial of due process which has had the effect of terminating permanent civil service employment

---

**2.** The Supreme Court eventually held that state court judges were not covered by the ADEA. *See* *Gregory v. Ashcroft*, — U.S. —, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

and stigmatizing the plaintiffs in an occupation peculiarly susceptible to such a stigma."

In the case at bar, I will assume in plaintiff's favor that neither the Supreme Court nor the Second Circuit would apply the particularly stringent standard of *Sampson* to non-economic claims of private employees alleging employer discrimination. Nevertheless, review of the cases finding irreparable harm on the basis of such claims clearly demonstrates that Pollis has failed to make the requisite showing.

The rule I derive from these cases is that the resultant non-economic effect upon the employee of the employer's adverse action must have about it an extra dimension which distinguishes the case from those of all other employees similarly situated. Applying that rule to the instant case, it is simply not sufficient that Pollis, blessed with good health at age 70 and able to pursue her academic specialty on the world stage, resents the change in her faculty status sought to be imposed upon her by the New School. To hold that those circumstances are sufficient to demonstrate irreparable harm would open the floodgates to preliminary injunctions in a manner which I conclude is contrary to law.

Surely the circumstances confronted by the three teachers in the cases relied upon by Pollis were quite different. The employer's action in each case separated the teacher entirely from the school or university. Pollis has the opportunity to remain, as the result of the importuning of her department chair, who recognizes the New School's continuing need for Pollis's teaching skills in the area of human rights. Moreover, the teacher in *Chalk* found himself in a particularly poignant position by reason of his AIDS-shortened life expectancy. The university professor in *Saunders* was a younger woman, denied tenure, whose dismissal from the university would bring about a gap in her professional experience which would prejudice her irreparably in seeking faculty appointments elsewhere. These factors are not present in the instant case. Similarly, the state court judge in *Hawaii* faced total exile from the bench; the district court was careful to note that he "would not even be allowed to serve

as temporary judge." Pollis is able to continue as a adjunct professor at the New School, with a reasonable expectation of continued access to the institution's facilities.

Unlike the plaintiff in *Callicotte*, there is no proof in the case at bar that Pollis lacks any personal or family resources, or is clinically depressed and at risk of suicide if the preliminary injunction does not issue. Unlike the plaintiff in *May*, Pollis is guaranteed a full and prompt hearing on her discrimination claim; nor has the New School treated her in a way which personally stigmatizes her. That factor also serves to distinguish this case from that of the plaintiffs in *Keyer*.

I conclude that Pollis has failed to demonstrate that she will be irreparably harmed if a preliminary injunction does not issue before a decision on merits of her underlying claims can be rendered. Accordingly, Pollis has failed to make the threshold showing required by the Second Circuit in all preliminary injunction cases. Therefore it is unnecessary for me to consider the balancing of the hardships between the parties.

It is appropriate to stress that I reach this conclusion on the basis of the present record, including inferences which it seems to me reasonable to draw from that record. My denial of plaintiff's motion for a preliminary injunction puts an end to this Court's limited subject matter jurisdiction prior to issuance of an EEOC right to sue letter. But it is easy enough to hypothesize materially different circumstances. If Pollis reports for duty in the fall as an adjunct professor with the additional responsibility of mentoring or supervising candidates for master's and doctoral degrees sufficiently advanced in their work, and encounters a denial of office space reasonably necessitated by her responsibilities, a denial of full library privileges, a barring of the door to the computer facilities, and a pretense on the part of the institution telephone switchboard that Pollis is no longer affiliated with the New School, or any combination of these deprivations (which Provost Walzer gave the Court to understand should not be anticipated), then the Court might well take a different view of the matter. Certainly Pollis, in such circumstances, could revive the Court's limited subject matter jur-

isdiction, and apply again for preliminary injunctive relief.

On the present record, however, plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.